# EXHIBIT  1

**From:** Roberts, Mark
**Sent:** Tuesday, August 31, 2021 7:39 PM
**To:** willienardbanks@gmail.com
**Cc:** Walsh, Dani; Beckerleg, Derk
**Subject:** Chestnut Run Drive road drainage easement

Mr. Banks, as noted by Supervisor Walsh, please direct any future correspondence on this issue to this office. I have been reviewing this matter and while I respect your opinion on the issue of the Land Division Act, I believe there is more involved regarding the maintenance of roads and road drainage. I do not believe MCL 560.253(2) requires the Township to maintain the road drain easement, or any infrastructure placed in the easement. The Township does not maintain roads in the Township; maintenance of roads and related infrastructure is typically a function of the Road Commission. The question is whether this is a Road Commission responsibility or the responsibility of your subdivision association to initiate a special assessment district. While the Township is authorized to form a special assessment district for road maintenance and/or storm water drainage maintenance, this would require a petition, and the costs would be assessed to the benefitted properties. I am currently reviewing MCL Chapter 247 for maintenance responsibilities for roads (MCL 247.851 defines "Highway" as a highway, road or street, for purposes of the Act). I am continuing to review the options regarding this situation and will give it priority, given the seemingly rapid decline of the drain's condition, but my initial thought is that this is a Road Commission issue. Mark.



**Mark S. Roberts**
*Attorney at Law*
2600 Troy Center Drive | P.O. Box 5025 | Troy, MI 48007-5025
Direct: (248) 539-2815
Office: (248) 851-9500 x 2511
Fax: (248) 251-1806
mroberts@secrestwardle.com
www.secrestwardle.com

     

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAWS. IF YOU ARE NOT THE INTENDED RECIPIENT, EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US VIA E-MAIL. INTERNET COMMUNICATIONS ARE NOT GUARANTEED TO BE SECURE OR ERROR-FREE. INFORMATION CAN ARRIVE LATE OR INCOMPLETE, BE INTERCEPTED, CORRUPTED, LOST, DESTROYED, OR CONTAIN VIRUSES. THEREFORE, WE DO NOT ACCEPT RESPONSIBILITY FOR ANY ERRORS OR OMISSIONS THAT ARE IN THIS MESSAGE OR ANY ATTACHMENT. IF VERIFICATION IS REQUIRED, PLEASE REQUEST A HARD-COPY. THANK YOU.

# EXHIBIT 2



# EXHIBIT 3



# EXHIBIT 4



# EXHIBIT 5



# EXHIBIT 6

No. 348614

STATE OF MICHIGAN COURT OF APPEALS

# Youmans v. Charter Twp. of Bloomfield

Decided Jan 7, 2021

No. 348614

01-07-2021

JAMILA YOUMANS, and all others similarly situated, Plaintiff-Appellee/Cross-Appellant, v. CHARTER
TOWNSHIP OF BLOOMFIELD, Defendant-Appellant/Cross-Appellee.

---

PER CURIAM.

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the
Michigan Appeals Reports.* UNPUBLISHED Oakland Circuit Court
LC No. 2016-152613-CZ Before: STEPHENS, P.J., and MURRAY, C.J. and SERVITTO, JJ. PER CURIAM.

In this certified class action, plaintiff Jamila Youmans, who is the sole class representative, challenged certain
municipal utility rates and ratemaking practices of defendant, Charter Township of Bloomfield ("the
Township"). Defendant appeals as of right the trial court's amended judgment, entered after a bench trial, that
awarded plaintiff and the plaintiff class permanent injunctive relief and more than $9 million in restitution.
Plaintiff has filed a cross-appeal, challenging the trial court's refusal to award damages for certain components
of the Township's water and sewer rates.[1] We affirm the trial court's ruling concerning plaintiff's claims based
upon a violation of § 31 of the Headlee Amendment, Const 1963, art 9, § 31, reverse its judgment awarding
monetary and equitable relief to plaintiff and the plaintiff class, and remand for entry of a judgment of no cause
of action in favor of the Township.

[1] By leave of this Court, the Michigan Municipal League and the Michigan Townships Association have submitted an
amicus brief that supports the Township's position. *Youmans v Charter Twp of Bloomfield,* unpublished order of the
Court of Appeals, entered January 29, 2020 (Docket No. 348614).

## I. FACTUAL AND PROCEDURAL BACKGROUND

2    *2

This case arises out of plaintiff's challenge to various aspects of the Township's water and sewer rates and its
related ratemaking methodology during the "class period," which commenced on April 21, 2010, for purposes
of plaintiff's assumpsit claims (i.e., six years before plaintiff initiated this action) and on April 21, 2015, for
purposes of plaintiff's Headlee claims (i.e., one year before plaintiff initiated this action). In October 2016, the
trial court entered an order "certifying this case as a class action" and appointing plaintiff as the sole class
representative. Plaintiff's amended complaint included six counts, the first of which asserted several claims for
violation of § 31 of the Headlee Amendment, and the remainder of which asserted claims for
**"ASSUMPSIT/MONEY HAD AND RECEIVED"** with regard to both certain specific components of the



Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.215   Filed 02/01/23   Page 13 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

Township's water and sewer rates and the "arbitrary, capricious, and unreasonable" nature of those rates and the underlying ratemaking processes. After the trial court denied the parties' competing motions for summary disposition, the matter proceeded to a 10-day bench trial.

## A. THE UTILITY SYSTEMS AND BASIC RATEMAKING METHODOLOGY

Wayne Domine, the director of the Township's "engineering and environmental services" department from 1991 until his retirement in May 2017, testified that the Township consists of approximately 18,000 parcels of realty, approximately 3,000 of which are not serviced by the Township's water utility. The water system provides treated, potable water to its municipal customers, but it is also used for firefighting capability, providing water to the Township's fire hydrants.

According to Domine, much of the Township's water system was privately constructed by real estate developers beginning in the 1920's. The infrastructure was originally a piecemeal collection of "several subdivision well water supply systems throughout the township." However,

> [i]n 1963, the township had decided that the existing well systems would not be adequate to provide the water quality and quantity required to maintain the projected future demands of the community. The connection to the City of Detroit system was found to be most dependable for the health and welfare of the township residents. Several miles of transmission mains were constructed. . . . Since then over 200 miles of lateral water mains have been extended into areas either by means of special assessments or developer funded projects.

Since 2004, the Township has been subject to an abatement order, which arose out of litigation with the Michigan Department of Environmental Quality (DEQ), to "dry out" the sewer system, i.e., prevent water infiltration into the system. After performing a long-term needs study, the Township approved a 20-year capital improvement program, which is funded by the inclusion of a "water debt charge" in the disputed utility rates.

Domine agreed that the Township's sewer system is a separated system, with "one set of pipes for sanitary sewage," and a separate storm-sewer system, which is "intended to collect storm water runoff or . . . water from the land" and discharges such water directly into a waterway. The *3 Township does not own its storm-sewer system, other than the storm drains that are on the property of the township. Rather, the storm-sewer system is owned and maintained, in concert, by several county and state entities. Oakland County bills the Township for the "sewer flow" that exits in the Township, as estimated by approximately 30 meters located in various areas, based on the Township's proportional contribution to the entire system. Conversely, the Township does not measure "sewer flow" in order to determine the rate that it charges its municipal sewage customers; it bases the overarching sewer rate on water usage, which is the common practice throughout Oakland County.

Domine was involved in the Township's annual budgeting (on a limited basis) and water and sewer ratemaking from before the class periods in this case commenced until his May 2017 retirement.[2] He also coauthored the "annual rate memorandum," which included an outline of recommended water and sewer rates and was presented to the Township "board" for approval each year. The "first" consideration in ratemaking was "to gather up all the expenses, and then determine a revenue that would cover those expenses." Put simply, the rates were intended to allow the Township to "[b]reak even," but the process is complex, generally taking place "over several months." By nature, the rates are predictive—intended to cover expenses that will be incurred after the rates are set—and thus they merely *estimate* the revenue that will be required. Accordingly, to provide a "margin of error," the rates were generally set to generate "a revenue stream slightly above" the projected expenses, but in some years during Domine's tenure, the "water and sewer fund" was operating at a deficit.

Case 2:23-cv-10258-LJM-EAS ECF No. 1-5, PageID.216 Filed 02/01/23 Page 14 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

Even so, and in at least one year, a midyear adjustment to the rates was required to prevent an excessive deficit. The ratemaking process employed by the Township did not focus on individual line items; it employed a holistic approach, focusing on generating sufficient overall annual revenue to cover the overall annual costs.

2   Thomas Trice, the director of the Township's Department of Public Works (DPW), testified that he was also involved in the disputed ratemaking process during the pertinent timeframe.

Jason Theis testified that he served as either the Township's finance director or deputy finance director at all times pertinent to this case, during which time he was also involved in the annual budgeting process for the Township's water and sewer fund. Theis is a certified "public finance officer," which is akin to being a certified public accountant, but with an exclusive focus on governmental, rather than private, finance and accounting. He indicated that, in setting the disputed utility rates, it was desirable to budget both revenues and expenses "conservatively," in hopes of ensuring sufficient revenue to cover expenses. As a result, with regard to individual line items in the budget, the actual amounts received or expended often varied considerably from the projections used in setting the rates. Over the ratemaking period of six months, the disputed rates would go "through many different iterations."

According to Domine and Theis, the water rate included a "variable rate" for consumption, which was intended to recover the Township's operating expenses, depreciation improvements, and the cost of the water purchased from the Southeastern Oakland County Water Authority, and *4 the water rate also included a "fixed," "ready-to-serve" charge to cover extra operational expense. The fixed portion of the water rate generally represented about 80% of the utility's required revenue stream, and it was intended to help the Township cover its "steady stream of monthly expenses" despite fluctuating water use and revenue over time.

Similarly, Domine indicated that the sewer rate included a "variable rate," which was intended to recoup operating expenses (including treatment of raw sewage) and depreciation improvements, and the sewer rate also included a "fixed" charge that was intended to recover the remainder of the Township's operating expenses. In addition, both the sewer and water rates included debt service charges, which were assessed in amounts intended to pay the debt service on bonds or other obligations issued by the Township related to water and sewer.

The parties stipulated that some portion of the Township's utility ratepayers were not also on the "tax rolls" that fund the Township's general fund, citing examples including tax-exempt entities like churches. Domine indicated that about 80% of the Township's water customers are also sewer customers, with the remainder using septic-tank systems. A small portion of customers—about 3%—receive sewer services only; they are not water customers. Domine agreed that those "sewer only" customers are billed in one of two ways. The majority pay a fixed annual charge, while the remainder have elected to have a meter installed on their well-water line and are billed "for their sewer based upon actual water usage." Additionally, the water system permits homeowners to install a "secondary" water meter that measures water used outside the home (e.g., for lawn irrigation or swimming pools), and such water usage is not included when calculating the homeowner's sewer charges.

Because the Township has no way of determining the amount of "sewer" services a sewer-only customer uses, the "fixed annual charge" is determined by averaging the rate of the "sewer only" customers who have elected to have a water meter installed. Domine admitted that the sewer ratemaking methodology did not account for the sewer only customers explicitly. But Domine also indicated that, because the Township had been overestimating volume in an attempt to keep the sewer rate from excessively increasing, "a lot" of the time the Township did not collect enough "sewer revenue" to cover the associated costs fully.

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.217   Filed 02/01/23   Page 15 of 98

Youmans v. Charter Twp. of Bloomfield     No. 348614 (Mich. Ct. App. Jan. 7, 2021)

According to Theis, the budgeting program for the water and sewer fund—which he sometimes referred to as the creation of a "projected income statement"—involved "a lot of back and forth" "looking at five year trends of all the different accounts within the water and sewer fund," establishing projected figures for "operational" overhead (including staffing expenses), and projecting the anticipated water costs. Of the 18 different Township funds for which annual budgets and projections are prepared, the water and sewer fund was the only "enterprise fund" (i.e., a proprietary, non-tax revenue, self-sustaining fund, which charges for services provided, is not supported by a millage, and falls outside the operating township budget), and it was the most difficult to budget for because it involved "more guess work" than the other funds, particularly with regard to commodity charges and tap sales. For instance, the revenue received during a "dry season" would vary by "millions of dollars" from the revenue received in "a wet season[.]" In \*5 addition to the Township's 18 budgeted funds, Theis also oversees approximately another 10 that aren't budgeted. Most of the Township's utility customers were billed on a quarterly basis, while most of the "suppliers" billed the Township monthly. As a result, in calculating the necessary revenue flow to meet its utility expenses, the Township needed to plan to keep sufficient cash on hand from quarter to quarter.

As an expert witness, plaintiff called Kerry Heid, who is a "rate consultant specializing in the public utility field," ratemaking in particular, and has approximately 40 years of experience in that field. He agreed that the "first step" in utility ratemaking "is to determine the revenue requirement," i.e., the revenue that the utility will need to cover its expenses, and he also agreed that this involves cost projections regarding variable expenses that are generally unknown when the rates are set.

According to Heid, "almost industry-wide, the generally recognized standard to use for generally accepted cost of service and rate making practices for water utilities" was, at the time of trial, set forth in the seventh edition of "the American Water Works Association M1 Manual" (the "M1 Manual"). Heid's opinions in this case concerning the disputed water rates were based on those methodologies and principles. He indicated that there are "two generally accepted methods" by which a utility's revenue requirements are determined: (1) "the cash basis, or the cash method," and (2) "the utility basis." In Heid's opinion, the Township used the cash method in calculating the disputed rates. Under that method, a municipality determines "its cash needs" by considering expenses such as "debt service, which would include principal and interest on bonds or outstanding debt," "operating and maintenance expenses," taxes, "[a]nd any other cash needs that the utility would need in order to operate its utility." The total of such expenses constitutes the utility's "revenue requirement." In determining which expenses, precisely, are properly considered in ratemaking, a utility should only include an expense if it is "prudently incurred" and "necessary for the utility to operate."

According to Heid, after a utility has determined its anticipated revenue requirement, "[t]here are two different sources of funds that the utility needs to consider, such that the total of those fund sources would generate the needed revenue requirement": (1) rate revenue, and (2) "miscellaneous revenues," which are also known as "non-rate revenues." Non-rate revenue includes any "sources of revenue that the utility does receive over and above the actual rates that are developed by the utility." Before determining its rates, a utility should "net out the non-rate revenue from the total revenue requirement." For example, if a utility's initial revenue requirement was estimated to be $100,000, but it expected to generate non-rate revenue of $5,000, it should "design rates that would generate revenues of $95,000."

Heid indicated that, after determining its "net revenue requirement," the utility would determine what portion it "want[ed] to recover through a customer charge," such as the fixed portion of the Township's water rate, and how much the utility wanted to recover by way of "a volumetric charge" for water use. Although there is an element of "discretion" in deciding the proper ratio of the fixed customer charge and volumetric charge, Heid

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.218   Filed 02/01/23   Page 16 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

6    opined that the proper *6 method was to perform a "cost of service study," which is something that the Township had failed to do, instead relying on what Heid described as "an arbitrary allocation[.]" In any event, Heid indicated that after deducting the fixed charge from the revenue requirement, a utility should divide the remaining portion (i.e., the portion it wished to recover through a volumetric charge) by the expected "total usage," with the result of that equation equaling the appropriate utility rate. In Heid's view, it was "[a]bsolutely not" appropriate for a municipal utility to design its rates to "over-recover," i.e., to recover more than the utility's net revenue requirement.

The Township called Joe Heffernan as an expert witness. Heffernan is a certified public accountant and retired from Plante Moran with at least 30 years of experience in conducting "public sector" accounting audits and consultations. He indicated that municipalities are obliged to have such external audits performed under Michigan law. According to Heffernan, before he reviewed the financial statements in this case, the Township's independent auditing firm had "already looked at the underlying general ledger and tested the internal controls and looked for compliance with laws and regulations[.]" After doing so, the independent auditors issued an audit opinion indicating that the Township's "financial statements are fairly stated" and were "free of material misstatement," meaning that "they're reliable." Similarly, Heffernan discerned "nothing" in the financial statements that would have led him to suspect that the Township's water and sewer department was potentially failing to comply with any applicable regulatory law.

Heffernan testified that Plante Moran audits "125 communities in southeast Michigan." About "[a] third to half of them don't" issue rate memoranda or any other "formal written document" explaining their utility-ratemaking methodology. Nor was he aware of any "requirement" for municipalities to do so. In setting their utility rates, such municipalities "just look at two things, what do our cash reserves look like, do they seem too high or too low, what's the percentage increase that we're going to get from our supplier, and based on whether their cash is too high or too low they bump . . . up or bump . . . down" the rates. Such "simple" ratemaking was "really common," and it "seem[ed] to work," historically resulting in relatively proportional cash inflows and outflows for the utilities that employ it.

Heffernan agreed that it is "possible to reach a reasonable water and sewer rate using a flawed rate model" or no model at all, and he also agreed that "mathematical precision" in calculating rates is neither required nor possible because rate models are based on predictions, "[a]nd honestly, every single one of your individual projections will be wrong" to one degree or another. "[T]he numbers are so big . . . and can change by so much you really have to accept a certain amount of fluctuation and variation[.]"

The Township also called Bart Foster as an expert, with his expertise "in the area of municipal water and sewer service rate setting[.]" Foster has "30-plus years' experience" in "providing financial, management consulting, and rate consulting services to predominantly municipal water and waste water utilities." He has performed such services for "between 10 and 20" municipalities in Michigan, and he was "pretty much regularly engaged for over 30 years with the Detroit Water and Sewage Department until they transitioned into the Great Lakes

7    Water *7 Authority" (GLWA). At the time of trial, he was employed as a consultant at the GLWA, and he indicated that he was familiar with Michigan regulatory law regarding municipal utilities.[3]

3   In substance, Foster's relevant expert opinions were largely identical to those expressed by Heffernan.

## B. "LOST" WATER AND "CONSTRUCTION" WATER

Case 2:23-cv-10258-LJM-EAS  ECF No. 1-5, PageID.219  Filed 02/01/23  Page 17 of 98

Youmans v. Charter Twp. of Bloomfield     No. 348614 (Mich. Ct. App. Jan. 7, 2021)

According to Domine, one factor that was considered in setting the water rates was "non-metered water," which was, in essence, "lost" water that the Township purchased but never actually sold. This occurred for "a variety" of reasons, such as broken water mains, leaks, "[c]onstruction water" (i.e., water used in the construction and maintenance of the water system itself), "billing inaccuracies," "meter inaccuracies," and "lag time" in meter reading. During the relevant "class period" years, Domine had estimated the anticipated "lost" water, for ratemaking purposes, at between 5% and 7% of the Township's annual projected water purchase. Such "lost water" figures were included in setting the water rates, intended to offset the cost of the water that the Township had purchased but never sold to its metered customers.

According to Heffernan, "water loss" is something that he commonly encountered in auditing municipal utilities because one "key" metric in "every" such audit was a comparison between "the volume of water purchased and sold by the water and sewer fund[.]" On the other hand, Foster indicated that he disfavored the use of the phrase "lost water"—preferring to use the phrase "unaccounted-for water"—because "lost water" is an "unduly simplified" description. Terminological disputes aside, Foster agreed with Domine and Heffernan about the essential underlying concept, explaining that for a municipality like the Township, which has no water "production facilities" and instead "purchases water wholesale," unaccounted-for water "would simply be how much water is being purchased on a wholesale basis from the provider . . . compared to how much water [the municipality] sells to the customers[.]" Such unaccounted-for water was generally attributable to "the possibility of inaccurate meter reads, both on the purchase side and on the sales side," "natural leakage out of the pipes," and "uses of water for construction purposes that's unmetered[.]" Foster indicated that "the Township had an unaccounted-for water percentage of between 4 and 5 percent," which was "on the low" or "medium side" for municipalities in southeast Michigan. He opined that, because unaccounted-for water was "a cost of maintaining the system," "it is appropriate to recover that" cost in the corresponding utility rates, and it would be inappropriate for the water and sewer fund or the Township's general fund to bear such expense.

Domine indicated that "construction water" is used primarily in "the flushing and filling of the water mains that are being built," in "pressurizing the main," and also when "doing bacteria testing." In his opinion, the use of such unmetered construction water is "necessary . . . for the operation of the system itself[.]" *8

8

## C. WATER USED BY TOWNSHIP FACILITIES

In addition to "lost" water, Domine agreed that "the township's facilities use water, but there isn't a check written from the water and sewer fund to the general fund for the value of that water[.]" He explained that, rather than paying for such water with cash, the Township provides in-kind "services and value" to "the water and sewer fund," the value of which "exceeds the value" of the water used by the Township's facilities. Domine and Theis admitted that they were aware of no formal documentation of such in-kind remuneration. As an example of one such in-kind service, Domine indicated that Township firefighters performed inspection, "flushing, and some of the maintenance" on the Township's fire hydrants. As other examples, Theis indicated that his services and those of his staff (i.e., accounting, finance, and human resources services) are provided to the water and sewer fund at no charge, as are the services of the Township's "IT department," which spends approximately 10% of its resources servicing the water and sewer fund. That fund is also provided "maintenance" and "cleaning" services by Township employees.

Although some of the municipal buildings are equipped with water meters, readings were never taken, and thus there was no record of precisely how much water was used by the municipal facilities during the pertinent timeframe. As part of this litigation, however, Domine prepared an estimate of the water used by the Township's facilities, estimating a total annual use of approximately 3.8 million gallons. Based on that figure, he estimated that the combined water and sewer services provided to the Township facilities was worth

Case 2:23-cv-10258-LJM-EAS  ECF No. 1-5, PageID.220  Filed 02/01/23  Page 18 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

approximately $35,000 annually,[4] while the water provided to the Township's fire hydrants was valued at $10 per hydrant, for a total of $31,000. Domine and Theis each estimated the value of the Township's in-kind remuneration for such services to be more than $100,000 annually.

[4] Heid indicated that the $35,000 estimate was facially reasonable.

Contrastingly, Heid indicated that any in-kind remuneration that the Township provided to the water and sewer fund was inadequate because, based on his estimations, the value of the "public fire protection" services rendered to the Township by the water utility "was in excess of a million dollars every year[.]" And with regard to fire hydrant water usage, Heid indicated that the $10 estimate per hydrant was "grossly inadequate and without any basis[.]"

According to Heffernan, most municipalities "typically" have water meters installed on municipal buildings, and their water and sewer departments typically bill the general fund for such water use. Foster agreed, indicating that he does not "normally see . . . the practice employed by [the] Township" of accepting in-kind remuneration for water from the general fund rather than directly billing the general fund for the water used by municipal facilities. But according to Heffernan, based on his experience with "other communities of a similar size," he estimated that the true value of the in-kind services provided to the water and sewer department by way of *9 "general fund" dollars was "in the neighborhood of" $700,000 or $800,000. On that basis, Heffernan opined that he would not consider the Township's facilities to be receiving "free water."

On the other hand, Foster indicated that the value of the water used by the Township facilities and the in-kind services provided to the water and sewer fund were "close to being a wash[.]" But he also indicated that the Township's in-kind remuneration strategy was "perfectly reasonable" and opined that the disputed utility rates would most likely go up, not down, if the Township were to undo the in-kind arrangement and, along with beginning to pay for water used by Township facilities, also begin to charge the water and sewer department for all of the services that it had previously received from the Township at no charge.

## D. "NON-RATE" REVENUE

Domine indicated that he never employed the term "non-rate revenue" while working for the Township and had not heard that term before this litigation commenced; rather, he categorized such revenue as "other revenue." His testimony concerning the treatment of non-rate revenue in the ratemaking process was somewhat convoluted. He agreed that the annual rate memoranda "probably" contained no "discussion" of non-rate revenue—those memoranda "never" specified all of the "expenses" underlying the recommended rates—but he disagreed that non-rate revenue was "not factored into" the rate "model" for the disputed utilities, explaining that they were considered as part of the "revenue stream" for the Township's annual budget, but not as a source of revenue attributable to the disputed rates. Later, however, Domine testified that "non-rate revenue . . . is *not* included in the rate calculation. It's considered as extra revenue to pay towards the expenses." (Emphasis added.) Later still, when Domine was asked, "[Y]ou weren't recovering all of your budgeted expenses through the rate, but instead were leaving some of them off because you anticipated getting non-rate revenue[?]", he replied, "Yeah, that—that would be what I've been saying all along." He also indicated that non-rate revenue was "reflected in the numbers" in the annual rate memoranda, explaining that the total operating expenses listed in those documents were actually "the net expenses, after deducting the non-rate" revenue. Notably, Domine qualified his answers somewhat by stating that his memory of such issues was hazy, given that he had retired, and questions about non-rate revenue would be better directed to the Township's finance director, Theis. But

Domine also indicated that he "kn[e]w for a fact" that he had deducted non-rate revenue from the total operating expenses before calculating the disputed rates. In effect, this benefited the utility customers, lowering rates.

When the trial court asked Domine whether the deduction of non-rate revenue from total operating expenses had "historically" been "manifest" in his "paperwork," he replied, "It—it just came up in the last couple years . . . you got to understand, for 20 some years, a lot of it, I just did it[.]" Historically, Domine had performed the calculations informally for his own use, using *10 "notepads and sticky notes," rather than documenting the process formally.[5] However, during his final two years working for the Township, he had created a detailed spreadsheet to explain to his replacement "how the process works[.]" The spreadsheet showed the same process by which Domine had deducted non-rate revenue from the total operating expenses "in the past."

[5] Theis described the prior methodology as, for "lack of a better term," "back of a napkin" calculations, which were not performed "consistently" during the relevant timeframe.

Theis agreed that, with the exception of "the '16, '17 rate memo," the rate memos for the other fiscal years at issue here did not include any "calculation that deducts non-rate revenue before setting the rate." Like Domine, however, Theis disagreed with the contention that non-rate revenue had not been accounted for in calculating the disputed rates, indicating that it had been used to offset projected annual expenses in ratemaking. Theis indicated that certain informal spreadsheets, which he had prepared for his own use in prior years, documented that process of incorporating non-rate revenue into the rates. Theis considered a specific item of non-rate revenue to be attributable as revenue of the water and sewer department if it was "directly related" to those utility services.

On the other hand, Heid indicated that, other than the Township's "rate document for fiscal year 2016-17," in his review of the documents provided to him in this case, Heid had "absolutely not" seen "any evidence" that non-rate revenue was properly accounted for in calculating the disputed rates. On the contrary, after comparing the "operating expenses that were reflected in the budget" for each class-period year "to the operating expenses that were utilized in the" corresponding "rate making model" for that year, Heid opined that the numbers indicated that the Township had not duly "netted out" the non-rate revenue in any fiscal year other than the one beginning in 2016. Heid summarized: "My opinion . . . is that the utility's reasoning or explanation for the treatment of non-rate revenues does not hold water, that they did not net out the non-rate revenue from the operating expenses as reflected in the rate memos." The Township's failure to deduct non-rate revenue "was not a reasonable rate making practice" because it "is commonly accepted that the non-rate revenues should be deducted from the total revenue requirement when establishing rates," and in Heid's reckoning, "if the rate methodology is faulty," then it is not possible to determine whether "the rate is reasonably proportionate" to the underlying utility costs.

On cross-examination, Heid indicated that he had "solely derived" his opinions concerning whether non-rate revenue was duly incorporated into the disputed rates by reviewing the annual "rate memorandums." He had not reviewed any "underlying work papers."

Although Heffernan agreed that non-rate revenues should be accounted for in ratemaking, he indirectly criticized Heid's methodology, indicating that it was not useful to compare the numbers in the rate memoranda and those in the water and sewer fund's annual "budget" because such documents are prepared "at two different points in time," "for two different purposes," utilizing different accounting principles. Thus, inconsistencies

casetext

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.222   Filed 02/01/23   Page 20 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

11   between the two documents were *11 to be expected. Heffernan explained that "quite often" the budget does not
have "a great relationship to what actually happens" after the budget is set, and the same is true with regard to
rate memoranda.

Heffernan further explained that his analysis of the issues in this case involved "looking through the financial
statements, some of the other documents ancillary to the financial statements, and most importantly, having
some open discussion with the finance director, [the Department of Public Works (DPW)] director, and talking
through what's behind the numbers in order to come to a conclusion." He focused on the financial statements
particularly, "because those are what actually happened," whereas the annual utility "budget" was "merely a
plan of what you may expect to happen," intended to permit the Township board to grant its "permission" for
the "the various department heads . . . to conduct business and spend up to certain amounts for certain
purposes." Similarly, although "rate memos can help inform you as to" the thought process employed in
ratemaking, they cannot demonstrate the results—"what really happened"—like financial statements do. For
that reason, financial statements are vitally important in auditing municipal utilities. They permit an auditor to
assess whether the revenues *actually* received by a utility are "proportional" to the *actually* incurred underlying
expenses.

Foster's opinions in this case were also primarily founded on his review of the Township's financial statements,
and he agreed with Heffernan that they are preferable to the water and sewer fund's budgets and rate
memoranda because it was best to evaluate "the effect" of rates and charges "after the fact[.]" Foster added that
having been independently audited, the "financial statements have a degree of review that is arguably more—
more rigorous than a budget or a rate memoranda."

After reviewing the Township's relevant financial statements, Heffernan and Foster both opined that the
Township had duly accounted for non-rate revenues during the pertinent timeframe, although its calculations
concerning non-rate revenue were not set forth in the rate memoranda. As Heffernan put it, "The work just
wasn't shown." Even so, Heffernan believed that the financial statements and the proportionality of the water
and sewer fund's cash flows during the relevant timeframe "clearly" demonstrated that the Township had
properly accounted for non-rate revenue in the disputed rates. Heffernan expounded, "That's the great thing
about the financial statements, you can't hide. It's in there or else the auditor would be disclaiming their opinion
and saying everything is wrong."

Additionally, Heffernan indicated that even assuming, for the sake of argument, that the Township had *not* duly
accounted for non-rate revenue in setting the disputed rates, that failure, standing alone, was insufficient to
render the rates "unreasonable[.]" Foster agreed, stating that "it wouldn't matter" because if the water and sewer
fund had recovered too much in the disputed rates, it would have either adjusted its rates accordingly or taken
the opportunity to prudently add to its reserve funds, and if it had recovered too little, "there would need to be
12   rate increases in order to get the reserves at . . . the prudent level." *12

When asked, on cross-examination, whether failure to account for non-rate revenues would result in "an
overcharge to the rate payers," Heffernan replied:

> Potentially. And the reason I say potentially is there's only an overcharge if in fact you have charged
> them more than their actual cost. And in the rates there are so many other things that could be
> inaccurate in your rate model and you don't know until you see what—and that's why I look at the
> financial statements, what were the costs, what was the revenue that came in, that tells you if you've
> overcharged.

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.223   Filed 02/01/23   Page 21 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

## E. THE COUNTY DRAIN CHARGES

Michael McMahon, who is an employee of the Oakland County Water Resources Commissioner's Office, testified that Oakland County assesses fees to its municipalities for maintenance of the county storm-sewer system. The charges for "chapter 4 drains" are generally "assessed . . . to individual property owners," although an "at large portion" is assessed to the municipality and some municipalities pay the "chapter 4" charges on behalf of their residents, while the charges for "chapter 20 drains" are "assessed to municipalities at large."[6] The county also charges municipalities a combined sewer overflow facility fee.

6  Domine indicated that, to his knowledge, the Township does not pass any of its "chapter 4 drain" charges onto its tax base or ratepayers.

According to McMahon, in 2015, the Township was in arrears of approximately $346,560 with regard to its county drain charges because, before that time, the county "had sort of lapsed on some of [its] assessments." The same situation had occurred with multiple municipalities, and McMahon was tasked with getting all the drain funds out of deficit. Accordingly, he contacted Domine, seeking to establish a budgetary plan for the Township to satisfy its arrearage. Ultimately, it was agreed that the Township would do that over the course of a couple years so that they could budget for it.

Domine indicated that, as a result, in the fiscal year beginning April 1, 2015, the Township began including a line item in its water and sewer budget for "county storm drain maintenance" (the "drain charges"). Before that time, the Township's "chapter 20" drain fees had always been paid out of the Township's general fund with tax dollars, not included as an aspect of the disputed utility budgets. For example, in 2013, $23,000 was paid from the general fund to satisfy the drain charges. The first year after the switch, the new budgetary line item for drain charges was $200,000, which was included in calculating the disputed utility rates. An additional $200,000 was included in the same fashion the next year (i.e., in the fiscal year beginning April 1, 2016), and $75,000 was included for drain charges the year after that. *13

Domine was unable to explain specifically why the drain charges were shifted from a general-fund obligation to a component of the disputed utility rates, but he recalled the Township's finance director indicating that he was closing the particular general fund from which the drain charges had previously been assessed and reallocating the line items that had been paid out of that fund "to other accounts . . . that would be more appropriate[.]" Domine agreed that one of the functions of the storm-sewer system is to collect water that runs off the road so it doesn't flood the roadways, and the system also prevents soil erosion. However, Domine also testified that the Township does not own any of the roads within it, indicating that they are all owned by the county, the state, or private entities, and the county and state, not the Township, therefore have sole responsibility for installing any new drains that are required to ensure proper drainage from roadways. Trice agreed with that sentiment. According to Domine and Trice, the storm-sewer system also benefits the Township's separate sanitary sewer system by preventing the "infiltration or inflow" that the Township was ordered to remedy in the litigation with DEQ; by lowering the water-treatment charges incurred by the Township (and thereby lowering the disputed utility rates); and by preventing the backflow of raw sewage into the ground, the sewer system, and sewer customers' homes. Trice explained that the county storm drains run parallel with the Township's sanitary sewers, and thus anytime the storm-sewer system floods as a result of improper maintenance, storm water would get into the sanitary sewer system and could wreak havoc (e.g., it could collapse Township pipes).

## F. RENT CHARGES

According to Theis, in 2014, the Township began to charge the water and sewer department annual rent of $350,000, which was included as an expense in the disputed ratemaking process in the years that followed. Such rent was paid by the water and sewer fund—by way of a quarterly journal entry in the ledger—to the Township's general fund, for the use of the DPW facility. The DPW facility was constructed "probably" sometime between 2007 and 2009, and it was financed by a new debt millage. The water and sewer fund had occupied the DPW facility since sometime in 2009 or 2010. The Township's motor pool also occupied several automotive repair bays at the DPW facility, which were used to service all of the Township's different departments and funds.

Trice testified that he was the individual who established the amount of the disputed $350,000 rent charge. He calculated that figure by estimating that the water and sewer department was occupying about 30,000 square feet of the DPW facility's total 77,000 square feet, then applying an estimated annual rental rate of $12 per square foot. Trice established that estimated rental rate of $12 per square foot based on storage space that the Township was already renting out in the local district court building, and the figure was also approved of by the Township assessor. In setting the $350,000 annual rent, Trice opined that the Township had used the lowest number available. In his opinion, it would have yielded a much higher rental figure had the Township based the rent on an allocation of all of the actual costs associated with the DPW facility, such as insurance, accounting, IT, HR, administration, and consultants. Trice also indicated that the disputed rental figure was calculated only by reference to the space in the DPW facility actually *14 occupied by the water and sewer department, it did not include the areas occupied by other departments, such as the motor pool.

In Theis's estimation, the annual rent of $350,000 was reasonable, given the Township's related expenses for depreciation and bond interest with regard to the DPW facility, which were, in concert, over $400,000 a year. In addition, the Township incurred costs for ongoing maintenance, operation, and cleaning of the DPW facility, and it paid a share of the facility's utility bills for gas and electric. In a broader sense, Theis believed that it was appropriate for the water and sewer fund to pay rent for its office space because, "as an enterprise fund, they should be self-sustaining, and all costs and revenues should be coming from and to that base of customers, as opposed to taxpayer[s] in general."

With regard to the disputed rent charges, plaintiff called James Olson as an expert witness. Olson is the director of a company that specializes in preparing federally mandated cost allocation plans for governmental entities, including municipalities. Olson testified that, in his professional opinion, the $350,000 annual rent charge was not "appropriate because it's not based on cost," i.e., "the cost of the facility, . . . utilities, maintenance, insurance; anything that related to capital improvements on the building once it's built, [and] that kind of thing." To the extent that the rent was instead based on depreciation and the interest associated with debt for that facility, Olson viewed that methodology as improper because those expenses were already "paid for" by the special millage that had financed the DPW facility. Olson explained, "Well, if you're a taxpayer, you're paying for the building and its interest cost in a separate bill, so you're paying for that once. You wouldn't pay for it again in the rate that you pay for your water and sewer." In Olson's estimation, the amount of rent charged by the Township for the DPW facility bore no discernible relationship to the properly considered costs, it was instead improperly based on an estimated market rate. However, because of the limited information that had been provided to him, Olson had admittedly been unable to determine the Township's annual maintenance expense for the DPW facility, and he acknowledged that it was "possible that there's some maintenance expense

Case 2:23-cv-10258-LJM-EAS ECF No. 1-5, PageID.225 Filed 02/01/23 Page 23 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

that could properly be charged" to the water and sewer fund. Olson also indicated that his opinion concerning the propriety of the Township's methodology in calculating the disputed rental figure involved a philosophical "gray area" of accounting principles.

On cross-examination, Olson admitted that, as an enterprise fund, it was appropriate for the water and sewer fund to be funding its own office space somehow, and he was not of the opinion that it was *altogether* inappropriate for the Township to charge that fund some amount of rent. Additionally, Olson conceded that it would be appropriate for the Township to consider the central service costs related to the DPW facility— including accounting, financial, auditing, human resources, insurance, security, legal, and "IT" services—in determining the proper rental amount, along with "general administrative expenses[.]" Because plaintiff's counsel had not supplied Olson with the necessary information, Olson had been unable to prepare a full cost allocation plan for the water and sewer fund, and he was also unable to comment on how, precisely, the Township had calculated the disputed rental amount. Finally, Olson admitted that, although he was not aware of any federal funding related to the DPW facility, his opinions in this case were based exclusively *15 on federal regulations establishing guidelines for development of indirect costs for federal programs.

When asked to critique Olson's opinion concerning the rent charges, Heffernan indicated that Olson's reliance on federal regulations was inappropriate because those regulations do "not apply to any spending that's not of federal dollars," and although every township in Michigan receives at least "a little bit" of federal funding in the form of a community development block grant, only those specific federal funds must be spent in accordance with the federal regulations relied on by Olson. Heffernan also disagreed with Olson's ultimate opinion that the disputed rent charges were inappropriate. In Heffernan's view, there were "hundreds of activities" funded by the Township's general fund that impacted the water and sewer fund's finances, and the overarching concern was to ensure that the overall allocation of expenses was "fair" when viewed in the context of the "whole system." Indeed, after performing such a review in this case and learning about all of the services that the Township's general fund provides to the water and sewer department without compensation, Heffernan believed that the $350,000 annual rent for the DPW facility represented "undercharging," not an overcharge.

## G. OPEB CHARGES

Domine confirmed that "OPEB" charges—i.e., charges for "[o]ther post-employment benefits"—were one budgetary line item that was factored into the disputed utility rates. According to Theis, "OPEB refers to benefits which are primarily health insurance expenses that the township is obligated . . . to pay on behalf of retirees," including both those already retired and current employees who will become retirees in the future. Aside from health-insurance expenses, which are by far the largest OPEB item, all expenses of retirees fall under the broad penumbra of "OPEB" expenses.

Heffernan testified that, unlike pension funds, which Michigan municipalities are constitutionally required to keep funded at actuarially determined levels, there is no such requirement with regard to OPEB funding, and thus many municipalities "really kind of ignored" OPEB funding "up until about 15 years ago[.]" Under accounting principles set forth by the Governmental Accounting Standards Board (GASB) somewhere between 2006 and 2008, however, a municipality is required to treat its unfunded OPEB obligations as a liability, which tends to incentivize it to begin the process of properly funding such obligations.[7] In doing so, there is generally an element of "catch up"—i.e., setting aside funds for the amortization of the unfunded actual accrued liability —while also setting aside funds to pay for the OPEB costs of one's current employees. It is "strongly" recommended for municipalities to be proactive about funding their OPEB obligations because it reduces the

Case 2:23-cv-10258-LJM-EAS ECF No. 1-5, PageID.226 Filed 02/01/23 Page 24 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

that could properly be charged" to the water and sewer fund. Olson also indicated that his opinion concerning the propriety of the Township's methodology in calculating the disputed rental figure involved a philosophical "gray area" of accounting principles.

On cross-examination, Olson admitted that, as an enterprise fund, it was appropriate for the water and sewer fund to be funding its own office space somehow, and he was not of the opinion that it was *altogether* inappropriate for the Township to charge that fund some amount of rent. Additionally, Olson conceded that it would be appropriate for the Township to consider the central service costs related to the DPW facility— including accounting, financial, auditing, human resources, insurance, security, legal, and "IT" services—in determining the proper rental amount, along with "general administrative expenses[.]" Because plaintiff's counsel had not supplied Olson with the necessary information, Olson had been unable to prepare a full cost allocation plan for the water and sewer fund, and he was also unable to comment on how, precisely, the Township had calculated the disputed rental amount. Finally, Olson admitted that, although he was not aware of any federal funding related to the DPW facility, his opinions in this case were based exclusively *15 on federal regulations establishing guidelines for development of indirect costs for federal programs.

When asked to critique Olson's opinion concerning the rent charges, Heffernan indicated that Olson's reliance on federal regulations was inappropriate because those regulations do "not apply to any spending that's not of federal dollars," and although every township in Michigan receives at least "a little bit" of federal funding in the form of a community development block grant, only those specific federal funds must be spent in accordance with the federal regulations relied on by Olson. Heffernan also disagreed with Olson's ultimate opinion that the disputed rent charges were inappropriate. In Heffernan's view, there were "hundreds of activities" funded by the Township's general fund that impacted the water and sewer fund's finances, and the overarching concern was to ensure that the overall allocation of expenses was "fair" when viewed in the context of the "whole system." Indeed, after performing such a review in this case and learning about all of the services that the Township's general fund provides to the water and sewer department without compensation, Heffernan believed that the $350,000 annual rent for the DPW facility represented "undercharging," not an overcharge.

## G. OPEB CHARGES

Domine confirmed that "OPEB" charges—i.e., charges for "[o]ther post-employment benefits"—were one budgetary line item that was factored into the disputed utility rates. According to Theis, "OPEB refers to benefits which are primarily health insurance expenses that the township is obligated . . . to pay on behalf of retirees," including both those already retired and current employees who will become retirees in the future. Aside from health-insurance expenses, which are by far the largest OPEB item, all expenses of retirees fall under the broad penumbra of "OPEB" expenses.

Heffernan testified that, unlike pension funds, which Michigan municipalities are constitutionally required to keep funded at actuarially determined levels, there is no such requirement with regard to OPEB funding, and thus many municipalities "really kind of ignored" OPEB funding "up until about 15 years ago[.]" Under accounting principles set forth by the Governmental Accounting Standards Board (GASB) somewhere between 2006 and 2008, however, a municipality is required to treat its unfunded OPEB obligations as a liability, which tends to incentivize it to begin the process of properly funding such obligations.[7] In doing so, there is generally an element of "catch up"—i.e., setting aside funds for the amortization of the unfunded actual accrued liability —while also setting aside funds to pay for the OPEB costs of one's current employees. It is "strongly" recommended for municipalities to be proactive about funding their OPEB obligations because it reduces the

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

16  net present value cost of that benefit. Additionally, *16 Heffernan opined that municipalities have "a moral obligation" to do so, although there are still some communities that have not funded any of their OPEB obligations. He compared failing to fund OPEB requirements to not setting aside money for pension funds, which he viewed as "bonkers." He explained: "[T]o not pay today's cost for that really says I'm going to have employees provide me services and I'm going to tell them, in exchange for the services you provide me I'll give you a salary; I'll also give you this benefit that I'll ask your grandchildren to pay."

> 7  On cross-examination, Heffernan admitted that the GASB has no authority to *compel* municipalities to duly fund their OPEB obligations, only to direct them concerning how such obligations should be accounted for in financial documents.

In Theis's view, OPEB entitlements were "earned" by employees during their work tenure, and the Township's obligation to fulfill those entitlements accrued at the same time. Heffernan agreed with Theis that employees "earned" their OPEB benefits during their working career with the Township, although such benefits are "paid for," primarily in the form of insurance premiums, after the employees retire. Theis indicated that the inclusion of OPEB charges in the disputed utility rates began in 2009, by way of a resolution passed by the Township board, and at some point, the Township also began to include OPEB charges in the fees charged by its cable studio and building inspection fund. The amount of the disputed OPEB charges included in the utility rates— which varied over the relevant years from about $200,000 to approximately $577,000—was based on a "very complicated calculation" that was, in turn, based on "a moving target" in the form of the latest actuarial reports concerning the Township's future OPEB obligations. Ultimately, during the fiscal year that began March 31, 2016, the Township transferred the $2.7 million in OPEB charges that had accrued in the water and sewer fund into a return-yielding retiree health care trust, which is "dedicated to . . . currently retired water and sewer employees as well as trying to save for the future retirees of the water and sewer fund."[8] Since then, smaller annual contributions of the accrued OPEB charges have been deposited to that trust. Such OPEB funds are partially intended as "catch up" to cover some of the past service cost, which was necessary "because all the prior administrations didn't set aside that money as the employees were earning it, which is what you should do." Theis indicated that the Township's "OPEB costs are jumping up exponentially each year" and are "some of the largest in the state," with current actuarial projections anticipating the future OPEB obligations of the Township at more than $160 million, more than $10 million of which is attributable to retirees or employees of the water and sewer fund.

> 8  In the Township's "main operating funds"—its "general fund, road fund, and public safety fund," which employ about 80% of the Township's employees—at the close of each fiscal year, any surplus funds are used to fund a similar OPEB trust for the employees of those funds.

According to Theis, by paying $2.7 million into the OPEB trust, the Township made an immediate impact on its current OPEB expenses. "[T]he OPEB line item expense immediately decreased the following year," which resulted in a corresponding decrease in the disputed utility rates, particularly in light of certain recently enacted GASB accounting practices for municipalities. In part, Theis admitted that the OPEB charges in the disputed rates were necessary because the Township can only collect so much in a millage and they get rolled back by

17  Headlee and so forth. He indicated that, although he is aware of "nothing . . . that forces" the Township to *17 proactively set aside funding for its OPEB expenses, the Township's goal is to fully fund its OPEB obligations in trust, thereby relieving the current operating budget and rate payers from that retiree expense. Theis hoped that it would actually accomplish that goal sometime during his career, but he had doubts, given that, at the time of trial, the Township was "only 3 percent funded." In his view, the disputed OPEB charges were something that was ultimately for the benefit of not just the Township, but the rate payers, given that new

legislation was being contemplated that might force the Township to more aggressively fund its OPEB obligations, which could compel a more dramatic rate increase in the future. In Theis's opinion, it was prudent to be proactive, not reactive, with regard to such budgetary issues.

In Heffernan's view, there was nothing "improper" about the Township's transfer of $2.7 million to the OPEB trust. And Heffernan agreed that transfer will ultimately result in significant OPEB savings to the water and sewer fund because, once held in such a trust, up to 70% of the funds can be invested in "equities" with an expected annual return of 7% or more, whereas money held in the water and sewer fund is subject to certain regulations that has historically limited the annual return to under 1%.

## H. PUBLIC FIRE PROTECTION (PFP) CHARGES

Domine indicated that, aside from delivering potable water to the Township's customer, the municipal water system is also used for "firefighting capability," providing water to the Township's fire hydrants.

According to Theis, the Township's water customers receive a special benefit from the Township's fire hydrants because those hydrants are only placed along the course of the "public water system[.]"

Held agreed that the provision of fire protection capabilities is one of the two fundamental functions of a municipal water supply utility, with the other being the provision of potable water to municipal customers. By nature, however, those functions fundamentally differ insofar as municipal customers use water on a relatively constant basis, whereas a fire hydrant generally carries in a standby capacity, being used only when there is a fire or "the utility needs to flush their system for periodic maintenance." Nevertheless, the PFP function of a water system carries "a very significant cost" because "[g]enerally, . . . all of the facilities have to be oversized. They have to be two or three times the size that they would be" otherwise. Also, to provide PFP capability, a water system must have a source of supply that provides more water, a greater amount of elevated storage, larger water mains, and either extra higher-powered booster pumping stations. Hence, "[t]ypically, public fire protection is considered a service because public fire protection does require the utility to overbill, if you will, because it needs to be able to meet those particular demands when you do have a fire." Professional standards would generally require that the value of such PFP services be paid for out of a municipality's general fund, not borne by the municipal water utility and its ratepayers.

Held indicated that, in determining the portion of a utility's PFP expenses that is properly allocable to the municipality, there are two generally employed methods. The first, "preferable,"[*18] and "most widespread method" is to per-form "a fully allocated cost of service study where the utility actually calculates the capacity requirements associated with providing public fire protection service and determining the cost of providing that service and what the rate should be for providing that service." The second is an antiquated method that was developed in Maine in 1961 (the "Maine Curve method"). Under the Maine Curve method, the peak day requirements of the utility are calculated by multiplying the estimated average daily water usage by an "average peak" factor of 2½, thereby estimating the "peak day" (or "peak hour demand") on the system's water usage. Subsequently, the utility's overall "peak day requirements" are compared to the calculated peak day requirements associated with providing public fire protection, as calculated by a formula that is based upon population that establishes the estimated need of fire flow. The ratio between those two figures is then charted on a graph of "the Maine Curve" to determine what percentage of the water utility's gross revenue should be recovered by PFP charges assessed to the given municipality's general fund.

Held did not attempt to analyze the Township's PFP expenses under the preferable "fully allocated cost of service study" method because he had inadequate information, and it is "virtually impossible" to do so in the adversarial setting of litigation because the process relies on the candid opinions of the given utility's staff.

Case 2:23-cv-10258-LJM-EAS ECF No. 1-5, PageID.229 Filed 02/01/23 Page 27 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

members. Rather, for each year at issue in this case, Heid calculated the Township's public fire protection costs utilizing the Maine Curve methodology. In doing so, he estimated the Township's overall "peak day requirements" using the "average peak" factor of 2½, and he admitted that, if the Township's actual peak day requirements varied from that estimated figure, it would alter his analysis. Using the estimated figure, however, the results indicated that, during the relevant years, the Township's water and sewer fund should have recovered between 10% to 15% of its gross revenue by way of PFP charges paid by the Township's general fund. Indeed, under the Maine Curve method, the minimum appropriate charge to a municipality for PFP services is 6% of the water utility's gross revenues. Heid opined that the Township had acted improperly by failing to pay such expenses out of its general fund and instead recovering its PFP expenses in the disputed water rates, which effectively forced the water utility's "end use customers" to pay for PFP services that were provided to all of the Township.

On cross-examination, however, Heid admitted that the M1 Manual indicates that assessing PFP costs to the rate payers, rather than the municipal taxpayers, is one method for meeting any revenue requirement for the PFP costs. Moreover, it is a method that is, in Heid's experience, used "from time to time under certain circumstances," although he did not specify when or under what circumstances. Heid also reaffirmed that the M1 Manual embodies the generally accepted rate making principles for water utilities.

About 96% of Heffernan's auditing experience involved Michigan municipal and governmental entities, and he indicated that he had never before encountered a PFP challenge like the one at issue in this case. Indeed, as far as Heffernan knew, neither his direct clients nor any other client of Plante Moran had ever been subject to any kind of requirement to have a PFP charge like the one described by Heid, although Heffernan had encountered municipalities that did so voluntarily. Similarly, Foster testified that, "most" water distribution systems in

19  Michigan don't *19 even identify what the PFP costs are, and those that *do* generally recover such costs through their water rates, not by charging the general fund. Foster was aware of only one Michigan municipality that ostensibly recovered (or had in the past recovered) PFP charges in the fashion suggested by Heid, and it did so only because a local ordinance explicitly mandated the practice. When Foster was asked whether the Maine Curve method is "widely recognized as a method of determining fire protection costs" in Michigan, he replied: "I don't believe so. In the few instances that I'm aware that an entity goes through the practice of allocating . . . public fire protection costs, other methods besides the Maine curve are used."

Heffernan explained that, for municipal utilities, it is difficult to accurately follow generally accepted accounting principles (GAAP) concerning "revenue recognition" and "expense recognition," which is somewhat similar to the non-GAAP concept that is commonly referred to as the "matching principle." Under GAAP, "[e]xpenses should be recognized at the time the transaction occurs that causes you to incur a cost, regardless of when the cash flow goes out," and the same principle generally applies to revenues, although there are exceptions. In the context of municipal utilities, however, following such principles is difficult because water meters are generally read on a quarterly basis, and thus a utility can only estimate how much water was used at any given time. Accordingly, the goal is to use such estimates to "get it materially right."

On cross-examination, when Heffernan was asked whether he was "aware of . . . any state or local laws that require" PFP charges "to be incorporated as part of a general fund obligation as opposed to a water and sewer" fund obligation, he replied that he could think of only one such law. He had reviewed one attorney-prepared "interpretation" of the Revenue Bond Act of 1933, MCL 141.101 *et seq.*, which suggested "that if you have a revenue bond, . . . it's better to have the general fund paying for" PFP charges.

# I. CASH BALANCE OF THE TOWNSHIP'S WATER AND SEWER FUND

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.230   Filed 02/01/23   Page 28 of 98

Youmans v. Charter Twp. of Bloomfield     No. 348614 (Mich. Ct. App. Jan. 7, 2021)

According to Theis, the Township's "water and sewer" fund was one of several Township "funds" with its "own set of books," separate from the "general fund." As an "enterprise" fund, the state did not require the Township to maintain an annual "budget" for the water and sewer fund, but the Township nevertheless did so in the interest of "transparency" and accurate ratemaking. From 2011 to 2017, the water and sewer fund had total "cash inflows of 156-ish million dollars, and cash outflows" of "151 point something million." Theis opined that this represented clearly proportionate cash outflows of 96% of the cash inflows.

Theis agreed that, as of March 31, 2010, the Township's water and sewer fund included "about $4 million dollars of cash and cash equivalents[.]" One year later, on March 31, 2011, the fund included approximately $6.6 million in cash and cash equivalents; on March 31, 2012, it contained about $11.5 million; on March 31, 2013, it contained roughly $14.5 million; on March 31, 2014, it contained "in excess of $18 million"; on March 31, 2015, following annual capital-asset purchases of $5.7 million, it contained about $12.5 million; on March 31, 2016, after the $2.7 *20 million OPEB transfer, it contained approximately $7.8 million; and on March 31, 2017, it contained about $8 million.

After reviewing the water and sewer fund's cash flows over that same period and duly considering its non-rate revenues, Heffernan opined that those cash inflows and outflows, which were within 4 percent of one another over the course of the relevant timeframe, were "very proportional." If anything, Heffernan believed that the Township should have been "trying to increase their cash investment reserves a little bit" more. Put succinctly, his opinion was that from 2011 to 2017, the water and sewer fund's "total accumulation of cash, even though it varied from year to year, wasn't unreasonable[.]"

Foster agreed that the disputed rates and charges were both reasonable and proportional to the underlying utility costs, summarizing his opinion as follows:

> Based on my review of the water and sewer rates in place between 2010 and 2017, . . . the revenues generated by the water and sewer rates have been commensurate with the revenue requirements of the water and sewer enterprise fund to provide service to the customers of the Township. The amount of money recovered through those rates has been proportionate to the cost of providing the service to the residents and businesses in the Township.

On cross-examination, however, Foster conceded that, hypothetically speaking, even if the disputed rates were duly proportional to the underlying utility expenses, the water and sewer fund could nevertheless use the revenue *generated* by such rates for clearly improper purposes, such as purchasing an expensive vacation home for the Township's board members.

Theis confirmed that the Township's water and sewer fund operated at a net loss in four of the fiscal years from 2005 to 2010, which forced the Township to subsidize it with cash from other Township funds. In 2010, for example, the water and sewer fund ended "9 of the 12 months . . . with negative operating cash." Over the years, Theis implemented multiple changes aimed at remedying such shortfalls, and since 2012, the water and sewer fund had no negative balances at any month end, although there had been "low balances." One month in 2017, for example, the fund was left with only $1,800 in cash on hand. Theis also endeavored to build up a sufficient "emergency reserve" in the water and sewer fund to address emergent breaks and repairs of items such as water mains, which can cost "hundreds of thousands of dollars" or even "millions" to repair, along with operating reserves, debt reserves, and capital improvement reserves. According to Theis, such reserve funding is essential "for the prudent operation of a healthy water and sewer fund," and despite his best efforts, he

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.231   Filed 02/01/23   Page 29 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

believed that the water and sewer fund was "still not in a position to have proper reserves[.]" He further opined that having total reserves of about $13 or $14 million was a "pretty conservative, appropriate . . . target to get to."

Theis admitted that, in reviewing financial statements for the disputed years, he found one instance in 2015 where a $600,000 expense was mistakenly counted twice in setting the disputed utility rates, thereby raising the rates. But he highlighted this as proof of how important it is to *21 view the water and sewer fund as a whole, rather than focusing on individual line items, noting that despite including the $600,000 expense twice in setting the rates for 2015, those rates ultimately resulted in an overall loss for the water and sewer fund that year, raising insufficient revenue to cover the fund's annual expenses.

Heffernan indicated that although there's no exact science to determine how much a municipal utility should keep in reserves, the water and sewer fund's reserves of about $4 million in 2010 "felt a little bit low." There is a consensus among experts that it is appropriate to maintain reserves for two fundamental areas: operating expenses and capital expenses (including future capital projects). In practice, Heffernan generally recommended that his clients maintain operational reserves of about 25% of their annual operating revenue, while his recommendation concerning capital reserves was dependent on the capital expenses the client anticipated in the next two to three years. Although a municipality could instead fund its capital projects on a pay-as-you-go basis, that was a "somewhat riskier" approach that Heffernan would "probably" advise against. After reviewing the water and sewer fund's 20-year capital plan, Heffernan opined that in the neighborhood of $13.9 million was an appropriate reserve target, and he agreed that the reserve levels at the time of trial were still "well below" what was advisable.

Foster added that his review of the Township's financial records during the relevant timeframe demonstrated that "the amounts that were specifically identified on the rate memoranda as capital improvements, and the amounts that were actually, from the audited statements, spent on capital improvements over that time period are remarkably close." This supported his opinion that the rates and charges have generated revenues commensurate with the revenues required to operate and finance capital improvements to the system over the time in question.

In addition, Heffernan opined that a municipality's reserve level is an appropriate consideration in both municipal utility ratemaking and in determining the proportionality of disputed utility rates. In short, a utility should "be setting [its] rates in a manner that will get the reserves where they should be." If the reserves are too low, rates should be increased—even if this results in temporarily "disproportional" cash flows—and the converse is equally true. On cross-examination, Heffernan admitted that the Township did not have a written plan with regard to its target reserve figures, but he explained that, based on the other 125 cities and townships that he was familiar with as an auditor, it was "highly unusual" for a municipality to have such a written plan.

## J. TRIAL COURT'S OPINION, JUDGMENT, AND AMENDED JUDGMENT

*22

Following the parties' closing arguments, the trial court took the matter under advisement and, on July 12, 2018, it announced its opinion orally from the bench.[9] The court ruled in favor of the Township with regard to all of plaintiff's claims pursued under § 31 of the Headlee Amendment, entering a judgment of no cause of action with respect to those claims. Generally, the court reasoned that, under the test set forth in *Bolt v City of Lansing*, 459 Mich 152; 587 NW2d 264 (1998), plaintiff failed to demonstrate that the disputed charges in this case constituted unlawful tax exactions.

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

9  It appears that the trial court had prepared some sort of written decision, which it read into the record rather than issuing a written opinion.

Turning to plaintiff's common-law claims for assumpsit for money had and received, the trial court ruled partially in favor of both parties. With regard to non-rate revenue and revenue attributable to the Township's sewer-only customers ("sewer-only revenue"), the court ruled in plaintiff's favor despite repeatedly finding that in light of the Township's ratemaking methodology—which the court referred to as "abstruse, recondite methodology"—the court was unable to determine whether the disputed rates were proportional to the associated utility costs and, if not, what "damages" figure was warranted. The trial court also chided the Township for failing to "show its work," indicating that, based on the record before the court, it was "not evident that the rates are just and reasonable."

This was a common theme in the trial court's decision. The court recognized that both *Novi v Detroit*, 433 Mich 414, 428-429; 446 NW2d 118 (1989), and *Trahey v Inkster*, 311 Mich App 582, 594, 597-598; 876 NW2d 582 (2015), held that municipal utility rates are presumed to be reasonable and that the plaintiff bears the burden of rebutting that presumption when challenging such rates. But the trial court indirectly criticized *Trahey's* reasoning, and it refused to rely on the presumption of reasonableness in deciding this case. The court described that presumption as a "substitute for reason" and an exercise in "thoughtless thoughtfulness," at least as applied here; suggested that *Novi* and *Trahey* are outdated, having relied on caselaw from "1942 and 1943"; and indicated that application of the presumption of reasonableness in this case would "bastardize the presumption" and "absolutely, necessarily, unequivocally transform it into an unrebuttable presumption[.]" In support, the trial court reasoned that "[i]t is clear from a reading of the law that a presumption exists once the details are on the table for all to see. First comes the details, then comes the presumption." In this instance, the trial court reasoned, the Township's unclear ratemaking methods had

> impeded the Court, and more importantly, [the] customer[s] and taxpayers from passing upon the question of whether the [Township's] rates are proportionate to its costs. This impediment, abstrusity . . . estops invocation of the presumptive reasonableness, the thoughtful thoughtfulness presumption of the rates. Short of

23  *23

> blind deference to [the Township], . . . [the Township's] impediment . . . hamstrings the Court . . . from even being able to hear a claim of disproportion. In a word, if the presumption were to prevail here, the presumption is and evermore shall be . . . unrebuttable.

After ruling in plaintiff's favor on that basis regarding the non-rate revenue and sewer-only revenue, the trial court reserved its ruling concerning the proper "damages" figures. The court indicated that, if the parties were unable to settle concerning such figures, the Township would be permitted to "chime in" with regard to why, in light of the Township's failure to "show its work," the court should not simply accept plaintiff's related damage calculations. After subsequently considering the matter further, the trial court awarded a "refund to Plaintiff and the Class" of approximately $2.935 million with regard to the "non-rate revenue" claim and about $2.173 million with regard to the sewer-only revenue.

As to plaintiff's claim concerning "lost water," the trial court also ruled in plaintiff's favor. After construing Bloomfield Township Ordinance § 38-225 ("The township shall pay for all water *used* by it in accordance with the foregoing schedule of rates. . . .") (emphasis added) and § 38-226 ("All water service shall be charged on the basis of water *consumed* as determined by a meter installed on the premises of the user by the department.") (emphasis added), the court agreed with plaintiff that, under those provisions, "[i]f water is not consumed, as

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

determined by a meter under [§ 28-226], then by process of elimination, or by default, [it] must be water used by the Township under [§ 38-225]." Put differently: "The cost for this truly lost water bucket per ordinance . . . was destined to be borne on the shoulders of the general fund taxpayers." The trial court also rejected any argument that the Township paid for such "truly lost water" by way of the in-kind services it provides to the water and sewer fund. Rather than ruling concerning the amount of "damages," the trial court instructed the parties "to crunch the numbers."

As to water "used" by the Township's municipal facilities, the trial court held that, although the Township's "rationalization" concerning in-kind remuneration was "obfuscated," plaintiff had failed to "overcome . . . the presumptive reasonableness of the Township's decision to pay" for such water with in-kind services. The trial court also rejected plaintiff's contention that the in-kind arrangement violated Bloomfield Township Ordinance § 38-225, reasoning that the ordinance "does not specify" that in-kind services cannot be used as a form of payment. Nevertheless, the trial court found "liability in Plaintiff's favor" and in favor of the plaintiff class. It awarded no monetary "refund" but ordered defendant to "henceforth" and "permanently" provide "explicit accounting . . . with explicit valuations" of the in-kind services that the Township provides as payment to the water and sewer fund, including payments for "construction water," "lost water," PFP charges, rent, and water used by municipal facilities.

On the other hand, with regard to "construction water," the trial court held that such water is "used" by both the Township and the ratepayers within the meaning of Bloomfield Township Ordinance § 38-225, and it rejected the argument that the Township paid for such water via the in-kind services it provides to the water and sewer fund. On that basis, the trial court ruled in *24 plaintiff's favor concerning the construction water, again reserving its ruling concerning the amount of "damages" and instructing the parties "to crunch the numbers." After further considering the matter, the trial court eventually entered an amended judgment ordering the Township to issue "a refund to Plaintiff and the Class in the amount of" approximately $3.69 million related to "the Township's own water use," which seemingly covered both "lost water" and "construction water."

With regard to plaintiff's non-Headlee claim concerning the disputed county drain charges, the trial court stated no reasoning in support of its holding. Rather, it simply stated: "Storm water drain, judgment, no cause of action."

As to the disputed rent charges, without explaining its reasoning, the trial court ruled in plaintiff's favor with regard to "[l]iability," but it refused to award any "damages[.]" However, as noted earlier, it issued a permanent injunction against the Township, ordering it to explicitly document any in-kind services used to pay such rent charges.

Similarly, with regard to OPEB charges, the trial court ruled in plaintiff's favor with regard to "liability," but it refused to award any "damages[.]" However, the trial court permanently enjoined the Township to "explicitly document the OPEB dollars in setting its water and sewer rates." The trial court reasoned that the Township's commingling of OPEB-charge revenues that had not yet been funded into the OPEB trust with "surplus" funds in the water and sewer fund was improper given that, until such OPEB funds were transferred to trust, they could be utilized by the water and sewer department "for whatever it deems appropriate."

Finally, as to PFP charges, without explaining its reasoning, the trial court ruled "no cause of action in part," and "liability in Plaintiff's favor in part," initially holding that plaintiff "prevail[ed] in a dollar amount equal to the cost of water in fire hoses over the relevant time frame paid by the general fund." After considering the matter further, however, the trial court entered its amended judgment holding that plaintiff and the plaintiff class were entitled to no "refund" in that regard because the Township "already pays" for such water by way of

24

19

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

in-kind services. But the trial court issued a permanent injunction ordering the Township to expressly document such in-kind services and their associated valuations, and it also ordered the Township provide "explicit accounting of water in fire hoses to be paid for by the general fund[.]"

Approximately two months after the trial court announced its decision, it held a hearing concerning the proper remedies in this case. While entertaining argument in that respect, the trial court asked plaintiff's counsel whether, in light of the Township's "abstruse, recondite" ratemaking, there was some "legal vehicle" by which the court might award plaintiff "damages" despite its having found both that it was unable to determine whether the disputed rates were actually disproportionate to the associated costs and that the amount of any disproportionality was impossible to determine based on the record evidence. The trial court indicated that it *25 would keep that issue "on the backburner" and allow plaintiff to argue the issue further at a later date. *25

Less than two weeks later, however, the trial court entered its initial judgment in this case. That initial judgment explicitly indicated that it was not a final order and that the trial court retained jurisdiction "for all purposes[.]" But in a subsequently entered order, the trial court ruled: "[T]he inquiry to plaintiff was and remains this: 'Is there a legal or equitable doctrine which would yield a judicial adjudication in favor of one party because the other party obscured proofs needed for that judicial adjudication?'."

Hence, about three months after the initial judgment was entered, plaintiff filed a motion for relief from judgment under MCR 2.612(C)(1)(f), requesting entry of an amended judgment on the basis that there were, in fact, several legal or equitable doctrine that would yield a judicial adjudication in plaintiff's favor because the Township had obscured proofs. At the ensuing motion hearing, the trial court indicated that plaintiff's motion was "inaptly titled" as a motion for relief from judgment and would, instead, be treated as a motion to "supplement" the initial judgment. The court acknowledged that it "remain[ed] unsure if the [Township] committed the singular wrong of passing a rate disproportionate to costs," explaining that, in the court's estimation, the "wrong" committed by the Township "was wont of clarity" in its "abstruse recondite rates[.]" Based on the caselaw cited by plaintiff, the trial court indicated that it was persuaded that "such wrong of unclarity itself . . . fulfills the element Plaintiff needed to prove that the Defendant's rates were disproportionate to costs in the amount of nonrate revenue and sewer-only receipts[.]"

Thus, the trial court granted plaintiff most of her requested relief, entering an amended judgment awarding plaintiff and the plaintiff class, in sum, approximately $9.58 million (including prejudgment interest) in "refunds," along with the permanent injunctive relief described earlier. The instant appeals ensued.

## II. ANALYSIS

## A. STANDARDS OF REVIEW

On appeal, the parties raise several distinct claims of error, which we review under varying standards. "This Court . . . reviews de novo the proper interpretation of statutes and ordinances," *Gmoser's Septic Serv, LLC v East Bay Charter Twp*, 299 Mich App 504, 509; 831 NW2d 881 (2013), and the legal question of whether a municipal utility charge constitutes an unlawful exaction under § 31 of the Headlee Amendment, *Mapleview Estates, Inc v City of Brown City*, 258 Mich App 412, 413-414; 671 NW2d 572 (2003). As a general rule, this Court also reviews equitable issues de novo, *Sys Soft Technologies, LLC v Artemis Technologies, Inc*, 301 Mich App 642, 650; 837 NW2d 449 (2013), reviewing any related factual findings by the trial court for clear error, *Canjar v Cole*, 283 Mich App 723, 727; 770 NW2d 449 (2009). "A finding is clearly erroneous if, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake was

made." *In re AGD*, 327 Mich App 332, 338; 933 NW2d 751 (2019). In reviewing a trial court's factual findings, "regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who
26    appeared before it." MCR 2.613(C). *26

However, a trial court's decision to grant equitable relief in the form of an injunction is generally reviewed for an abuse of discretion. *Dep't of Environmental Quality v Gomez*, 318 Mich App 1, 33-34 & n 12; 896 NW2d 39 (2016). "A trial court abuses its discretion when it chooses an outcome falling outside the range of reasonable and principled outcomes, or when it makes an error of law." *Planet Bingo, LLC v VKGS, LLC*, 319 Mich App 308, 320; 900 NW2d 680 (2017) (*Planet Bingo*) (quotation marks and citation omitted).

## B. PLAINTIFF'S ASSUMPSIT CLAIMS

The parties disagree whether the trial court's use of its equitable powers was proper here. As appellant, the Township argues that, having found that plaintiff had failed to demonstrate that the disputed rates were disproportionate to the underlying costs, the trial court erred by disregarding the presumption that those rates were reasonable. The Township also argues that the trial court erred by awarding plaintiff and the plaintiff class both the monetary award and permanent injunctive relief that it did. Contrastingly, by way of plaintiff's cross-appeal, she contends that the trial court should have awarded additional refunds related to the disputed OPEB, PFP, and rent charges. We agree with the Township that the trial court erred by failing to apply the presumption that the disputed rates were reasonable and abused its discretion by granting plaintiff permanent injunctive relief despite her failure to demonstrate that doing so was necessary to prevent irreparable harm.[10]

> 10   Our decision in this regard renders moot the Township's argument that the trial court erred or abused its discretion by amending its initial judgment to award additional "damages." Hence, we decline to decide that issue. See *Garrett v Washington*, 314 Mich App 436, 449; 886 NW2d 762 (2016) ("A matter is moot if this Court's ruling cannot for any reason have a practical legal effect on the existing controversy.") (quotation marks and citations omitted).

Aside from the claims that plaintiff asserted under the Headlee Amendment—which we analyze later in this opinion—plaintiff's claims in this action were all captioned as claims for **"ASSUMPSIT/MONEY HAD AND RECEIVED[.]"** As our Supreme Court long ago recognized in *Moore v Mandlebaum*, 8 Mich 433, 448 (1860):

> [T]he action of assumpsit for money had and received is essentially an equitable action, founded upon all the equitable circumstances of the case between the parties, and if it appear, from the whole case, that the defendant has in his hands money which, according to the rules of equity and good conscience, belongs, or ought to be paid, to the plaintiff, he is entitled to recover. And that, as a general rule, where money has been received by a defendant under any state of facts which would in a court of equity entitle the plaintiff to a decree for the money, when that is the specific relief sought, the same state of facts will entitle him to recover the money in this action.

27    *27 Accord *Trevor v Fuhrmann*, 338 Mich 219, 224; 61 NW2d 49 (1953), citing *Moore*, 8 Mich at 448. At common law, assumpsit was a proper vehicle for recovering unlawful "fees," "charges," or "exaction[s]"—including unlawful utility charges—that the plaintiff had paid to a municipality under compulsion of local law. See *Bond v Pub Sch of Ann Arbor Sch Dist*, 383 Mich 693, 704; 178 NW2d 484 (1970) (quotation marks and citations omitted). Notably, such an action "will not lie against one who has not been personally *enriched* by the transaction" because the fundamental "basis" of the action "is not only the loss occasioned to the plaintiff on account of the payment of the money, but the consequent enrichment of the defendant by reason of having received the same." *Trevor*, 338 Mich at 224-225 (quotation marks and citations omitted; emphasis added).

"With the adoption of the General Court Rules in 1963, assumpsit as a form of action was abolished. But notwithstanding the abolition of assumpsit, the substantive remedies traditionally available under assumpsit were preserved[.]" *Fisher Sand & Gravel Co v Neal A Sweebe, Inc*, 494 Mich 543, 564; 837 NW2d 244 (2013). Hence, an "assumpsit" claim is modernly treated as a claim arising under "quasi-contractual" principles, which represent "a subset of the law of unjust enrichment." *Wright v Genesee Co*, 504 Mich 410, 421; 934 NW2d 805 (2019).

In contemporary municipal utility ratemaking cases, a similar focus on principles of "unjust enrichment" is encapsulated within the rebuttable presumption that a municipality's utility rates are reasonable. See generally *Novi*, 433 Mich at 428–429; *Trahey*, 311 Mich App at 594, 597-598. In *Novi*, 433 Mich at 417-418, 428, our Supreme Court was charged with deciding whether MCL 123.141 had abrogated "the longstanding principle of presumptive reasonableness of municipal utility rates," had impacted the applicable burden of proof, or had altered the traditionally circumspect scope of judicial review. Ruling in the context of a *municipality's* wholesale-rate challenge under MCL 123.141(2)—not a *ratepayer's* challenge under MCL 123.141(3)—the Supreme Court held that MCL 123.141 had not meaningfully altered the presumption of reasonableness, burden of proof, or scope of judicial review, reasoning, in part, as follows:

> Historically, this Court has accorded great deference to legislatively authorized rate-making authorities when reviewing the validity of municipal water rates. . . .
>
> * * *
>
> [R]ate-making is a legislative function that is better left to the discretion of the governmental body authorized to set rates.
>
> * * *
>
> Michigan courts, as well as those in other jurisdictions, have recognized the longstanding principle of presumptive reasonableness of municipal utility rates. These courts have stressed a policy of judicial noninterference where the Legislature has authorized governmental bodies to set rates. As this Court noted in [*Plymouth v Detroit*, 423 Mich 106, 128-129; 377 NW2d 689 (1985)], the Court

28   *28

> in *Federal Power Comm v Hope Natural Gas Co*, 320 US 591, 602; 64 S Ct 281; 88 L Ed 333 (1944) stated:

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.237   Filed 02/01/23   Page 35 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

We held in [*Federal Power Commission v Natural Gas Pipeline Co*, 315 US 575, 62 S Ct 736, 86 L Ed 1037 (1942)] that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." (Citations omitted.)

* * *

The Michigan Legislature's intention that courts refrain from strictly scrutinizing municipal utility rate-making is reflected in several statutory provisions. . . .

Courts of law are ill-equipped to deal with the complex, technical processes required to evaluate the various cost factors and various methods of weighing those factors required in rate-making. The decision of the Court of Appeals, however, superimposes Michigan courts as ultimate rate-making authorities despite the absence of any express statutory language or legislative history that would support such a role in the rate-making process.

* * *

The concept of reasonableness, as recognized by the courts of this state and other states in utility rate-making contexts, must remain operable, in order to provide a meaningful and manageable standard of review.

* * *

29   *29

For these reasons, we hold that 1981 PA 89 [i.e., the public act that last amended MCL 123.141,] did not render inoperable the concept of reasonableness in the process of judicial review of municipal utility water rates. The burden of proof remains on the plaintiff to show that a given rate or rate-making method does not reasonably reflect the actual cost of service as determined under the utility basis of rate-making pursuant to MCL 123.141(2)[.] [*Novi*, 433 Mich at 425-433 (bracketed alterations added).]

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

Because *Novi* involved a rate challenge pursued by a municipality under MCL 123.141(2), not a ratepayer challenge pursued under MCL 123.141(3), *Novi's* statutory analysis focused almost exclusively on MCL 123.141(2). However, in *Trahey*, 311 Mich App at 594, 597-598, this Court expanded the scope of *Novi's* pertinent holdings, applying them in the context of a resident-ratepayer challenge under MCL 123.141(3). Thus, the presumption of reasonableness was extended to the rates a municipality charges its ratepayers. *Id.* at 594. The plaintiff bears the burden of rebutting the presumption of reasonableness "by a proper showing of evidence." *Id.* "Absent *clear evidence* of illegal or improper expenses included in a municipal utility's rates, a court has no authority to disregard the presumption that the rate is reasonable." *Shaw v Dearborn*, 329 Mich App 640, 654; 944 NW2d 153 (2019),[11] quoting *Trahey*, 311 Mich App at 595 (emphasis in *Shaw*).

> [11] The pending application for leave to appeal in *Shaw* has been held in abeyance pending our Supreme Court's decision in *Detroit Alliance Against Rain Tax v City of Detroit*, ___ Mich ___; 937 NW2d 120 (2020). *Shaw v Dearborn*, ___ Mich ___; 944 NW2d 720 (2020).

As authority for its position aside from *Trahey*, *Shaw*, and *Novi*, the Township relies on, among other things, two unpublished decisions of this Court that were decided together in 2019. Plaintiff argues that this Court should disregard those unpublished decisions because they are not binding and "were wrongly decided." Plaintiff is correct that unpublished decisions of this Court are not precedentially binding under MCR 7.215(C)(1), but she fails to recognize that they may nevertheless be considered as "persuasive or instructive" authority.[12] See *Kern v Kern-Koskela*, 320 Mich App 212, 241; 905 NW2d 453 (2017).

> [12] In the context of similar challenges raised under the Headlee Amendment, this Court has recognized that it "presumes the amount of the fee to be reasonable, unless the contrary appears on the face of the law itself or is established by proper evidence[.]" *Wheeler v Charter Twp of Shelby*, 265 Mich App 657, 665-666; 697 NW2d 180 (2005). But because the instant rate challenges are not pursued under the Headlee Amendment, such authority is not dispositive here.

In any event, the heart of the parties' dispute regards the manner in which the rule of law set forth in *Trahey* should be applied. Specifically, citing in support *Trahey*, 311 Mich App at 595 ("[a]bsent clear evidence of *illegal or improper expenses* included in a municipal utility's rates, a court has no authority to disregard the presumption that the rate is reasonable") (emphasis added), *30 plaintiff argues that in a ratepayer challenge like the one at bar (i.e., one pursued under MCL 123.141(3)), if a plaintiff *does* present clear evidence of either illegal or improper expenses included in a municipal utility's rates, the presumption of reasonableness is no longer a relevant consideration—that is, the plaintiff need not also demonstrate that the rates, viewed as a comprehensive whole, are unreasonable. Put differently, plaintiff argues that *Trahey* stands for the proposition that, in the face of illegal or improper expenses included in the disputed rates, she is not required to demonstrate that the rates actually *overcharged* for the related water and sewer services.

In stark contrast, the Township argues that, under *Trahey*, even if a *specific* expense that is included in formulating a challenged municipal utility rate is shown to be either illegal or improper, the plaintiff nevertheless bears the burden of both rebutting the presumption of reasonableness and proving that the disputed rates are unreasonable when viewed as a *whole*. In other words, the Township argues that absent a showing that the disputed rates actually overcharged plaintiff and the plaintiff class for the related water and sewer services, plaintiff's challenge to those rates—and her request for monetary "damages" in particular—is fatally flawed. We agree with the Township.

In our view, the flaw in plaintiff's argument rests less on a textual dissection of *Trahey* than it does on the fundamental nature of plaintiff's equitable "assumpsit" claims. "[E]quity regards and treats as done what in good conscience ought to be done." *Allard v Allard (On Remand)*, 318 Mich App 583, 597; 899 NW2d 420 (2017) (quotation marks and citation omitted). Had plaintiff sought a declaratory judgment that certain costs included in the disputed water and sewer rates were improper or illegal, perhaps she would be correct that the presumption of reasonableness would be irrelevant. Instead, however, by asserting her claims for assumpsit, plaintiff sought "restitution"—in the form of a refund to herself and the plaintiff class—of whatever amount was necessary to "correct for the unfairness flowing from" the Township's "benefit received," i.e., its "unjust retention of a benefit owed to another." See *Wright*, 504 Mich at 417-418, 422-423. Whether the Township would receive an unjust "benefit" from retaining the disputed rate charges in this case depends on whether the water and sewer rates, viewed as a whole, were unreasonable inasmuch as they were "excessive," not on whether some aspect of the Township's ratemaking methodology was improper. See *id*. at 419 ("Unjust enrichment . . . doesn't seek to compensate for an injury but to correct against one party's retention of a benefit at another's expense. And the correction, or remedy, is therefore not compensatory damages, but restitution. Restitution restores a party who yielded *excessive and unjust benefits* to his or her rightful position.") (emphasis added).

Plaintiff's strained interpretation of *Trahey* would permit an order of restitution in this case without any evidence or finding that the Township was enriched, let alone excessively compensated, by collecting and retaining the disputed utility charges. Moreover, even assuming, arguendo, that plaintiff is correct concerning this Court's holding in *Trahey*, she fails to recognize that, to the extent that *Trahey* might be read as inconsistent with our Supreme Court's decisions concerning the essential nature of unjust enrichment and restitution in *Wright*, or with *Novi*'s holding regarding the continued viability of the presumption of reasonableness, *Trahey* 31 must be *31 ignored under the doctrine of vertical stare decisis. See *In re AGD*, 327 Mich at 339 (noting that, under the doctrine of vertical stare decisis, only our Supreme Court has authority to overrule one of its prior decisions, and until that Court does so, its former decisions remain binding on all lower courts); *Allen v Charlevoix Abstract & Engineering Co*, 326 Mich App 658, 665; 929 NW2d 804 (2019) (noting that this Court is "required to ignore" its former published decisions "in favor of any conflicting Supreme Court precedent").

The application of such principles in this case is straightforward. On several occasions, the trial court explicitly found that plaintiff had failed to rebut the presumption of reasonableness or demonstrate that the disputed rates were excessive in comparison to the associated costs of providing the related water and sewer services. On this record, we perceive no basis to disturb those factual findings. On the contrary, without a comprehensive rate study—or some similar evidence demonstrating that the disputed rates excessively compensated the Township for the related utility services—one can at best speculate about whether the disputed rates were proportional to the underlying costs. And several of the testifying experts at trial specifically indicated that, based on a review of the Township's audited financial statements, its cash inflows and outflows over the disputed period were proportional. Therefore, we are not definitely and firmly convinced that the trial court made a mistake when it found that plaintiff had failed to demonstrate disproportionality in the rates.

In light of that finding, however, the trial court erred by nevertheless ordering defendants to refund more than $9 million to plaintiff and the plaintiff class. Given that plaintiff failed to demonstrate that the Township would be excessively (and thus unjustly) enriched by the retention of such funds, the trial court should not have ordered the refund that it did. See *Wright*, 504 Mich at 417-418, 422-423; *Trahey*, 311 Mich App at 594, 597-598.

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.240   Filed 02/01/23   Page 38 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

We also conclude that the trial court abused its discretion by granting plaintiff a permanent injunction requiring the Township to document its ratemaking efforts in a specified fashion. "Injunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, *and there exists a real and imminent danger of irreparable injury.*" *Jeffrey v Clinton Twp*, 195 Mich App 260, 263-264; 489 NW2d 211 (1992) (quotation marks and citation omitted; emphasis added). See also *Royal Oak Sch Dist v State Tenure Comm*, 367 Mich 689, 693; 117 NW2d 181 (1962) ("Equity should not be used to obtain injunctive relief where there is no proof that complainant would suffer irreparable injury."). Moreover, the party seeking injunctive relief has the burden of demonstrating that the requested injunction is appropriate and necessary. *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 3; 753 NW2d 595 (2008); *Dutch Cookie Machine Co v Vande Vrede*, 289 Mich 272, 280; 286 NW 612 (1939).

As noted, we find no basis to disturb the trial court's finding that plaintiff failed to demonstrate that the disputed rates were actually disproportionate to the underlying utility costs. Consequently, plaintiff also failed to demonstrate that the injunctive relief ordered by the trial court was necessary to avert irreparable harm. On this record, one cannot tell whether plaintiff or the plaintiff class suffered any harm at all as a result of the disputed rates or ratemaking practices, let *32 alone an *irreparable* injury or the real and imminent danger of suffering such an injury. By nevertheless granting a permanent injunction against the Township with regard to its ratemaking methodology, the trial court abused its discretion, overstepping the proper bounds of both its injunctive powers and the limited scope of judicial review that is appropriate in ratemaking cases such as this one. See *Dutch Cookie Machine Co*, 289 Mich at 280 (holding that the party seeking an injunction bears the burden of proving that its issuance is warranted); *Novi*, 433 Mich at 428, 431 (discussing "the difficulties inherent in the rate-making process," "the statutory and practical limitations on the scope of judicial review," and the general "policy of judicial noninterference where the Legislature has authorized governmental bodies to set rates").

## C. THE REVENUE BOND ACT OF 1933

As cross-appellant, plaintiff contends that the trial court erred by failing to recognize that the disputed PFP charges are unlawful under the Revenue Bond Act of 1933 (RBA), MCL 141.101 *et seq*. In particular, plaintiff argues that those charges are unlawful because they permit the Township to receive "free service" in contravention of MCL 141.118(1), which provides, in pertinent part:

> Except as provided in subsection (2),[13] free service shall not be furnished by a public improvement to a person, firm, or corporation, public or private, or to a public agency or instrumentality. The reasonable cost and value of any service rendered to a public corporation, including the borrower, by a public improvement shall be charged against the public corporation and shall be paid for as the service accrues from the public corporation's current funds or from the proceeds of taxes which the public corporation, within constitutional limitations, is hereby authorized and required to levy in an amount sufficient for that purpose, or both . . . .

Specifically, plaintiff argues that the Township receives "free" PFP services, in contravention of MCL 141.118(1), because the Township's water and sewer fund, not its general fund, pays for those services by incorporating the PFP expenses into the disputed utility rates.

13 The referenced subsection, MCL 141.118(2), is irrelevant here, given that it applies to "[a] public improvement that is a hospital or other health care facility . . . ." ———

13 The referenced subsection, MCL 141.118(2), is irrelevant here, given that it applies to "[a] public improvement that is a hospital or other health care facility . . . ." ———

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

Assuming, without deciding, that the RBA is applicable here, that plaintiff is entitled to pursue a private cause of action seeking damages for violation of the RBA (which is an issue that she has failed to brief), that such a private action constitutes a valid end-around of the presumption-of-reasonableness standard discussed in *Trahey* and *Novi*, and that plaintiff is correct that it *would* violate MCL 141.118(1) if the Township were to fail to pay for its PFP services in the manner alleged, plaintiff's argument is nevertheless unavailing. Plaintiff ignores the fact that, in the trial court's amended judgment, it expressly found that the Township did, in fact, pay for the disputed PFP expenses by way of in-kind remuneration provided to the water and sewer fund. In plaintiff's *33 brief as cross-appellant, she fails to explicitly argue that the trial court's finding in that regard was clearly erroneous, and we discern no basis for disturbing it.

33

There was extensive evidence at trial concerning the in-kind services the Township renders to its water and sewer fund, with Heffernan estimating their annual value at somewhere around $700,000 or $800,000. On the other hand, there was a relative dearth of evidence concerning the proper value for the trial court to ascribe to the PFP services. Plaintiff's own expert, Heid, admitted that the "preferable" method of assessing the value of such services was to perform "a fully allocated cost of service study" and that he had failed to do so, having instead used the "antiquated" Maine Curve methodology. Therefore, we are not persuaded that the trial court clearly erred when it found that the Township's provision of in-kind services constituted sufficient payment for the disputed PFP services. And in light of the finding that the Township *was* paying for those PFP services, we cannot conclude that the trial court erred by failing to hold that the Township was receiving "free" PFP services in contravention of MCL 141.118(1).

## D. MCL 123.141(3)

Plaintiff also argues that the trial court erred by failing to recognize that the PFP charges are unlawful under MCL 123.141(3) ("The retail rate charged to the inhabitants of a city, village, township, or authority which is a contractual customer as provided by subsection (2) shall not exceed *the actual cost of providing the service*.") (emphasis added). But plaintiff fails to explain how even a *proven* violation MCL 123.141(3), standing alone, exempts her instant claim from the presumption-of-reasonableness standard set forth in *Trahey*, 311 Mich App at 594, 597-598, which regarded a rate challenge pursued under the same statute: MCL 123.141(3). In our estimation, the rule of law set forth in *Trahey* concerning the presumption of reasonableness is binding here and that presumption must be applied. See MCR 7.215(J)(1). And for the reasons explained in part II(B) of this opinion, we conclude that plaintiff's assumpsit claims under MCL 123.141(3) are not viable in light of the presumption of reasonableness discussed in *Trahey* and *Novi*. Hence, we reject plaintiff's instant claim of error.

## E. PLAINTIFF'S CLAIMS UNDER HEADLEE § 31

Finally, plaintiff argues that the trial court erred or clearly erred by holding that the disputed OPEB, county drain, and PFP charges were not unlawful exactions under § 31 of the Headlee Amendment. We disagree.

"The Headlee Amendment was adopted by referendum effective December 23, 1978." *Shaw*, 329 Mich App at 652. It was "proposed as part of a nationwide 'taxpayer revolt' in which taxpayers were attempting to limit legislative expansion of requirements placed on local government, to put a freeze on what they perceived was excessive government spending, and to lower their taxes both at the local and the state level." *Durant v State Bd of Ed*, 424 Mich 364, 378; 381 NW2d 662 (1985). Such purposes "would be thwarted if a local authority could charge higher utility rates to raise revenue and then use some of the excess funds to finance a public-works project." *Shaw*, 329 Mich App at 643. As enacted, the Headlee Amendment "imposes on *34 state and local government a fairly complex system of revenue and tax limits." *Durant v Michigan*, 456 Mich 175, 182; 566 NW2d 272 (1997).

34

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

Plaintiff's claims here are pursued under § 31 of the Headlee Amendment, which provides, in pertinent part:

> Units of Local Government are hereby prohibited from levying any tax not authorized by law or charter when this section is ratified or from increasing the rate of an existing tax above that rate authorized by law or charter when this section is ratified, without the approval of a majority of the qualified electors of that unit of Local Government voting thereon. . . .

> The limitations of this section shall not apply to taxes imposed for the payment of principal and interest on bonds or other evidence of indebtedness or for the payment of assessments on contract obligations in anticipation of which bonds are issued which were authorized prior to the effective date of this amendment. [Const 1963, art 9, § 31.]

As our Supreme Court observed in *Durant*, 456 Mich at 182-183, "Section 31 prohibits units of local government from levying any new tax or increasing any existing tax above authorized rates without the approval of the unit's electorate." "Although the levying of a new tax without voter approval violates the Headlee Amendment, a charge that constitutes a user fee does not," and the party challenging a given municipal utility charge under § 31 "bears the burden of establishing the unconstitutionality of the charge at issue." *Shaw*, 329 Mich App at 653.

As authority in support of plaintiff's position, she primarily relies on *Bolt*, 459 Mich 152, which set forth a three-prong test for determining whether a municipal charge represents a permissible "user fee" or an impermissible "tax" under Headlee § 31. In *Shaw*, 329 Mich App at 653, this Court observed that in *Bolt*, our Supreme Court explained that

> "[t]here is no bright-line test for distinguishing between a valid user fee and a tax that violates the Headlee Amendment." *Bolt*, 459 Mich at 160. In general, "a fee is exchanged for a service rendered or a benefit conferred, and some reasonable relationship exists between the amount of the fee and the value of the service or benefit. A tax, on the other hand, is designed to raise revenue." *Id.* at 161 (cleaned up). Under *Bolt*, courts apply three key criteria when distinguishing between a user fee and a tax: (1) "a user fee must serve a regulatory purpose rather than a revenue-raising purpose"; (2) "user fees must be proportionate to the necessary costs of the service"; and (3) a user fee is voluntary in that users are "able to refuse or limit their use of the commodity or service." *Id.* at 161-162. "These criteria are not to be considered in isolation, but rather in their totality, such that a weakness in one area would not necessarily mandate a finding that the charge is not a fee." *Wheeler v Shelby Charter Twp*, 265 Mich App 657, 665; 697 NW2d 180 (2005) (cleaned up).

35    *35 Notably, the presumption of reasonableness regarding municipal utility rates is a "pertinent" consideration when considering the second *Bolt* factor. *Shaw*, 329 Mich App at 654.

In *Shaw*, 329 Mich App 650-652, 664-669, this Court recently employed the *Bolt* factors in considering a Headlee challenge somewhat similar to the one now at bar. The *Shaw* Court upheld the challenged water and sewer rates in that case, holding that they were permissible user fees. *Shaw*, 329 Mich App at 669. In part, this Court reasoned:

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.243   Filed 02/01/23   Page 41 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

[P]laintiff . . . posits that there are embedded taxes within her utility rates, arguing that a charge need not pay for infrastructure to qualify as a disguised tax. . . .

\* \* \*

Under the analysis suggested by plaintiff, a city could never use funds obtained from city-wide water or sewer ratepayers to install, repair, or replace any particular pipe or facility that is part of the overall water or sewer system. Take, for example, a water main that runs beneath a major thoroughfare on the west side of any average city. The water main does not transport water to the residential homes, commercial businesses, or industrial factories on the east side of that city. Yet, when the water main ruptures and must be repaired, the city can use funds obtained from the general pool of water ratepayers to make the repairs—without transforming its water rates into an unconstitutional tax. The city is not constrained by the Headlee Amendment to determine which specific homes, businesses, or factories in the city use water that flows through the specific water main that burst, and then use revenues derived from only those users to pay the cost of repairing that burst pipe. *When the city uses funds paid by water ratepayers throughout the entire city to pay for the repairs to the burst water main, that repair does not transform the city's water rates into an illegal tax on the ratepayers who use water that flows through pipes other than the one that burst. Rather, the water rates are used to operate and maintain a viable water-supply system for the entire city and the revenues used to make the repairs serve a regulatory purpose of providing water to all of the city's residents.* [*Shaw*, 329 Mich App at 663-665 (emphasis added).]

*Shaw*'s analysis of the *Bolt* factors strongly supports the propriety of the trial court's Headlee ruling in this case. Addressing the first factor, in *Shaw*, 329 Mich App at 666, this Court held that it was

beyond dispute that the city's water and sewer rates comprise a valid user fee because the rates serve the regulatory purpose of providing water and sewer service to the city's residents. Although the rates generate funds to pay for the operation and maintenance of the water and sewer systems in their entirety, this by itself does not establish that the rates serve primarily a revenue-generating purpose. "While a fee must serve a primary regulatory purpose, it can also raise money as long as it is

36   \*36

in support of the underlying regulatory purpose." *Graham v Kochville Twp*, 236 Mich App 141, 151; 599 NW2d 793 (1999). Further, . . . the cost of operating and maintaining the caissons, is part of the cost of providing sewer service to the city's ratepayers. Dearborn must provide sewer service in conformance with state and federal regulatory requirements, and keeping the caissons functional helps ensure that sewage is properly treated before it is released into the environment.

Similarly, in this case, it is undisputed that the contested rates are assessed to fund the operational and capital expenses of the Township's water and sewer system, which serves the primary function of providing water and sewer services to the Township's ratepayers. Moreover, to the extent that those rates result in surpluses during some fiscal years, Domine indicated that the Township's 20-year capital improvement program was, at least in part, necessitated by the entry of an "abatement order" against the Township, which arose out of litigation with the DEQ and regarded the level of water "infiltration" in the Township's sewer system. Categorically, such obligations arising out of administrative-agency regulations serve a regulatory purpose. On the strength of the entire record, we hold that the Township's act of raising a prudent level of both revenue and capital and

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.244   Filed 02/01/23   Page 42 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

operational reserves through the disputed rates—including revenue to fund its OPEB obligations, the costs of providing fire protection services to the community, expenses related to the county storm-drain system, and necessary capital improvements—primarily serves valid regulatory purposes.

Nor are we persuaded by plaintiff's contention that, because some who are not ratepayers may benefit from the water and sewer system, the disputed rates must be an improper tax. By way of example, although county storm-sewer systems certainly benefit the general public when viewed on a macro scale—e.g., by preventing roadways from flooding, limiting soil erosion and the pollution of waterways, and decreasing demand on regional wastewater-treatment facilities—the vast majority of governmental enterprises benefit the general public, rather than just one regional subset of the public, when viewed on such a scale. As in *Shaw*, plaintiff's proposed application of the first *Bolt* factor would effectively hamstring municipal utilities, preventing them from raising the funds necessary to comply with mandatory state and federal regulations if doing so will yield any sort of incidental benefit for society at large. In any event, viewing the disputed rates as a whole, we are persuaded that they primarily serve valid regulatory purposes under the first *Bolt* factor, which favors the determination that they are user fees rather than taxes.

In considering the second *Bolt* factor, in *Shaw*, 329 Mich App at 666-668, this Court reasoned, in pertinent part, that the disputed "water and sewer rates" in that case

> constitute[d] a valid user fee because users pa[id] their proportionate share of the expenses associated with the operation and maintenance of the water and sewer systems. Mathematic precision is not required when reviewing the reasonable proportionality of a utility fee. "Where the charge for either storm or sanitary sewers reflects the actual costs of use, metered with relative precision in accordance with available technology, including some capital investment component, sewerage

37    *37

> may properly be viewed as a utility service for which usage-based charges are permissible, and not as a disguised tax." *Bolt*, 459 Mich at 164-165 (cleaned up).

> * * *

> Plaintiff reasons that the amount of water that a ratepayer withdraws from the tap bears no relation to the amount of stormwater that enters the combined-sewer system, and she argues that funds derived from water ratepayers therefore cannot be used to pay for the construction, operation, or maintenance of anything related to stormwater without transforming the water and sewer rates into an unconstitutional tax. Plaintiff further argues that the city should design a system of charging property owners, rather than ratepayers, for the removal of stormwater that flows across their property before entering the combined-sewer system or the separated-storm system. Yet, under the Headlee Amendment, it is not this Court's role to determine whether a municipal government has chosen the best, wisest, most efficient, or most fair system for funding a municipal improvement or service. This Court's role, rather, is to determine whether a particular charge imposed by a municipal government is a true user fee or a disguised tax. [Quotation marks and citations partially omitted.]

In this case, on several occasions, the trial court expressly found that plaintiff had failed to demonstrate that the disputed utility rates were disproportionate to the underlying utility costs, and as already explained, we see no basis for disturbing that factual finding. Because plaintiff did not carry her burden of demonstrating

casetext

Case 2:23-cv-10258-LJM-EAS   ECF No. 1-5, PageID.245   Filed 02/01/23   Page 43 of 98

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

disproportionality, it necessarily follows that the second *Bolt* factor militates in favor of the Township's position. See *Shaw*, 329 Mich App at 653 (observing that "the plaintiff bears the burden of establishing the unconstitutionality of the charge at issue").

With regard to the final factor, this Court in *Shaw* ruled as follows:

> The third *Bolt* factor also weighs in favor of finding that Dearborn's water and sewer rates constitute a valid user fee. Each individual user decides the amount and frequency of usage, i.e., each user decides how much water to draw from the tap. See *Ripperger v Grand Rapids*, 338 Mich 682, 686; 62 NW2d 585 (1954) (explaining that "[n]o one can be compelled to take water unless he chooses" and that charges for water and sewer services based on water usage do not comprise taxes); *Mapleview Estates, Inc*[, 258 Mich App at 417] (holding that an increased fee for connecting new homes to water and sewer systems was voluntary because, *inter alia*, "those who occupy plaintiff's homes have the ability to choose how much water and sewer they wish to use"). The purported charges at issue in this case are voluntary because each user of the city's water and sewer system can control how much water they use. [*Shaw*, 329 Mich App at 669.]

The instant case is distinguishable from *Shaw* with respect to the third *Bolt* factor. In this case, the parties agree that the disputed water and sewer rates were each comprised of both a \*38 variable rate, which was based on metered water usage, and a fixed rate. Indeed, Theis testified that the fixed portion of the water rate generally represented about 80% of the utility's required revenue stream. Contrastingly, in *Shaw*, it was "uncontested that Dearborn determine[d] its water and sewer rates based on metered-water usage" alone. *Id*. at 667-668 (distinguishing *Bolt* on the basis that the disputed rates in *Bolt* were "flat rates," not variable rates based on "metered-water usage").

On this record, we conclude that use of the Township's water and sewer services cannot be viewed as "voluntary" for purposes of the *Bolt* inquiry. If a charge is "effectively compulsory," it is not voluntary. *Bolt*, 459 Mich at 167. With the exception of those sewer-only customers who have elected not to have a meter installed to track their actual well-water usage, it is technically true that the Township's water and sewer customers can avoid paying the *variable* portion of the disputed rates by refusing to use any water. But the *fixed* portions of those rates constitute flat-rate charges like those in *Bolt*, 459 Mich at 157 n 6, and such flat rates can only be avoided by not being a utility customer in the first instance. To the extent that the Township contends that the fixed rates are nevertheless voluntary because ratepayers can avoid paying them by moving elsewhere, that argument is unavailing. See *id*. at 168 ("The dissent suggests that property owners can control the amount of the fee they pay by building less on their property. However, we do not find that this is a legitimate method for controlling the amount of the fee because it is tantamount to requiring property owners to relinquish their rights of ownership to their property by declining to build on the property."). In light of *Bolt*, 459 Mich at 167-168, we conclude that at least the fixed portion of the disputed rates here—the most sizable portion—is effectively compulsory. Thus, the third *Bolt* factor weighs in favor of plaintiff's position.

On balance, plaintiff has failed to carry her burden of demonstrating that the disputed rates are impermissible taxes, rather than user fees, for purposes of Headlee § 31. The first and second *Bolt* factors clearly favor the conclusion that the disputed charges are proper user fees, and with regard to the third factor, "the lack of volition does not render a charge a tax, particularly where the other criteria indicate the challenged charge is a user fee and not a tax." See *Wheeler*, 265 Mich App at 666. Therefore, the trial court did not err by entering a no-cause judgment against plaintiff with regard to her Headlee claims.

Youmans v. Charter Twp. of Bloomfield    No. 348614 (Mich. Ct. App. Jan. 7, 2021)

Affirmed in part, reversed in part, and remanded to the trial court for entry of a judgment of no cause of action in the Township's favor. We do not retain jurisdiction.

/s/ Cynthia Diane Stevens

/s/ Christopher M. Murray

/s/ Deborah A. Servitto

 casetext

# EXHIBIT 7



# "CHESTNUT RUN"

A PART OF THE SE 1/4 OF SECTION 8, T. 2 N., R. 10 E.
BLOOMFIELD TOWNSHIP, OAKLAND COUNTY, MICHIGAN

**SURVEYOR'S CERTIFICATE:**

I, DAVID FANCALETTA, REGISTERED LAND SURVEYOR, DO HEREBY CERTIFY THAT I HAVE SURVEYED, DIVIDED AND MAPPED THE LAND SHOWN ON THIS PLAT UNDER THE DIRECTION OF THE OWNERS OF SUCH LAND, AND THAT THE ACCURACY OF SURVEY IS WITHIN THE LIMITS REQUIRED BY SECTION 126 OF THE ACT...

**PROPRIETOR'S CERTIFICATE:**

CHESTNUT RUN LIMITED PARTNERSHIP, A MICHIGAN LIMITED PARTNERSHIP...

**ACKNOWLEDGMENT:**

STATE OF MICHIGAN )
                  ) S.S.
OAKLAND COUNTY    )

PERSONALLY CAME BEFORE ME THIS ___ DAY OF ___ ...

NOTARY PUBLIC, OAKLAND COUNTY, MICHIGAN

MY COMMISSION EXPIRES: MAY 27, 1987

ALBERT C. GLINSKI

WITNESS:
JOANNE M. FLETCHER

GIFFELS-WEBSTER ENGINEERS, INC.
PONTIAC, MICHIGAN   48053

DATE: APRIL 10, 1986

EXAMINED AND APPROVED

Giffels-Webster Engineers, Inc.

8543

# EXHIBIT 8

**From:** CustomerService@oakgov.com
**Sent:** Tuesday, June 15, 2021 3:18 PM
**Subject:** Your Request has been processed; 438337

**Service Request Initial Notification**
**Road Commission for Oakland County**
**Resident Information**

**Request ID: 438337**                    Date Initiated:    6/15/2021 3:17:51 PM
**Problem Type:**   MAINT Culvert/Catch
                    Basin/Manhole
**Status:**         Not Started

**PROBLEM INFORMATION:**
| | | | |
|---|---|---|---|
| **District:** | D4 | **Road Type:** | SUB |
| **Address:** | 3173 Chestnut Run Dr | **Township Code:** | Blo |
| **City:** | Charter Township of Bloomfield | | |
| **Location Details:** | S OF HICKORY GROVE RD, W OF LAHSER | | |

**FIRST CALLER CONTACT INFORMATION:**
| **First Name** | **Last Name** | **Address** | **Home Phone** | **Work Phone** |
|---|---|---|---|---|
| BILL | BANKS | | 248-469-2682 | |

-

**Thank you for submitting your road concern.**

For additional information:

Call:
**(877) 858-4804** and provide your Request ID number

Email:
**dcsmail@rcoc.org** and provide your Request ID number in the subject line

# EXHIBIT 9

**From:** DCSMail
**Sent:** Wednesday, June 16, 2021 12:37 PM
**To:** WILLIENARDBANKS@GMAIL.COM
**Subject:** DCS REPORT 438337


Thank you for contacting the Road Commission for Oakland County (RCOC).

Per RCOC's Maintenance department and after review:
THE BASIN AND CULVERTS ARE CLEAN AND FLOWING.

Thank you,
Department of Customer Services

# EXHIBIT 10

# BLOOMFIELD TOWNSHIP
## Water Damage Claim Form

Full legal name(s) of Claimant(s): __Willienard Banks and Renee Baugh__

Full address(es) of Claimant(s): __3173 Chestnut Run Drive, Bloomfield Hills, Mi. 48302__

Telephone number(s) of Claimant(s): __248-469-2682__

Full address of affected property: __3173 Chestnut Run Drive, Bloomfield Hills, Mi. 48302__

Date of discovery of property damage and/or physical injury: __July 22, 2021__

Brief description of claim: __See Attachment__

_____

_____

Description of property/ item damaged, if any, and of any physical injuries: _____

_____See Attachment_____

_____

_____

_____ August 2, 2021

Claimant's Signature and Date

**Please Return Form To:**
Tom Trice, Director
Public Works Division
4200 Telegraph
P.O. Box 489
Bloomfield Hills, MI 48303-0489

**Pursuant to State Statue, an individual that has been injured or has suffered property damage as a result of a Sewage Disposal Event must provide written notice of the event within 45 days after the date the damage or injury was, or in exercise of reasonable diligence should have been discovered. Failure to provide proper notice will bar your claim.**

---

FOR OFFICE USE ONLY

Date received: _____

Copy sent to Accounting: _____

Report No. _____

Copy sent to MMRA: _____

**BLOOMFIELD TOWNSHIP**

AUG 0 2 2021

**PUBLIC SERVICES**

I have live at 3173 Chestnut Run Drive [ Lot 7] for thirteen years and never seen my yard or my neighbors' yard at 3197 Chestnut Run Drive [Lot 8] flood. However, for the last two months, I notice that back yard located at 3173 Chestnut Run Drive and my neighbors'[ the Jacksons] back yard located at 3197 Chestnut Run Drive was flooding.

Initially, I though the problem was that Orange Lake was rising due to all the rain; but most of the water would disappear after the rain stopped. I followed the direction that the water was flowing and found a large hole in the ground filled with water. On or about July 15, 2021, I ordered a Depstech dual lens inspection camera from Amazon. On July 17, 2021, I received the inspection camera from Amazon. Using the Depstech dual lens inspection camera, the next week, I determined that there was a large culvert that emptied into this hole. On or about July 22, 2021, I went to Home Depot and rented a water pump and emptied the culvert of water so that the culvert could be clearly seem and took pictures. A fast moving stream of water flood my back yard and .

The most recent flooding of the yards of Lots 7 and 8 was on Saturday, July 24, 2021. I sent an email to the Township on July 25, 2021, with copies to the owners of Lot 8, the Jacksons. The Jacksons think there is a break in the culvert where the water is eroding their side yard. There is a land swell in their yard that is getting worst.

Storm water from four of Bloomfield Township's street storm drains for Chestnut Run Drive is conveyed through a culvert that runs approximately 150 feet between the two properties commonly known as 3173 Chestnut Run Drive [Lot 7] and 3197 Chestnut Run Drive [Lot 8] and empties into a large hole in the back of the lots. The storm water exiting this hole floods the backyards of Lots 7 and 8.

Bloomfield Township's Plat maps shows a 150 feet drain easement between Lot 6 and Lots 7, not 7 and 8. Although there may be a 20 foot easement between Lots 6 and 7, there is no culvert. The culvert run between Lots 7 and 8. It appears that the Township is attempting to conceal the fact that it does not have a right to have this culvert between Lots 7 and 8. Damages could be in excess of $100,000.00.

The Fifth Amendment of the United States Constitution and Article 10, § 2 of Michigan's 1963 Constitution prohibit the taking of private property without just compensation. US Const, Am V; Const 1963, art 10, § 2. A claim of inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken . . . even though no formal exercise of the power of eminent domain has been attempted by the taking agency." "Inverse condemnation can occur without a physical taking of the property; a diminution in the value of the property or a partial destruction can constitute a 'taking.'" Mays v. Governor of Mich., 506 Mich. 157, 173, 954 N.W.2d 139, 148, (2020).



"CHESTNUT RUN"

A PART OF THE SE. 1/4 OF SECTION 9, T. 2 N., R. 10 E.
BLOOMFIELD TOWNSHIP, OAKLAND COUNTY, MICHIGAN

**From:** willienardbanks@gmail.com
**Sent:** Wednesday, July 28, 2021 9:49 PM
**To:** aaron.p.jackson@accenture.com
**Subject:** FW: NOTICE OF DEFECT- Pub Acts 2001, No. 222,

I sent this email to Road Commissioner Quarles. The file was to large , so you did not receive it. I am resending email to you without attachments, which you already have.

Bill Banks

**From:** willienardbanks@gmail.com
**Sent:** Wednesday, July 28, 2021 9:28 PM
**To:** Nancy Quarles
**Cc:** road@bloomfieldtwp.org; nmehalski@bloomfieldtwp.org; olivia.m.jackson@accenture.com;
aaron.p.jackson@accenture.com; Renee Baugh
**Subject:** FW: NOTICE OF DEFECT- Pub Acts 2001, No. 222,



Dear Commissioner Quarles-

For the last two months, I notice that my back yard located at 3173 Chestnut Run Drive and my neighbors' Olivia Jackson and Aaron Jackson back yard located at 3197 Chestnut Run Drive floods. Although the flooding has not yet reached my home's basement or foundation, I decided to determine what is causing the flooding. I have live at 3173 Chestnut Run Drive for thirteen years and never seen my yard or my neighbors' yard at 3197 Chestnut Run Drive flood. The Exhibits show the flooding on my property and the videos, provided by the Jacksons, show the flooding on their property. The fast moving stream of water on the Jacksons' property is coming from the defective culvert. The Jacksons think there is a break in the culvert where the water is eroding their side yard. There is a land swell in their yard that is getting worst.

I am of the opinion that Bloomfield Township is responsible for its subdivision roads, such as Chestnut Run Drive, Bloomfield Township. I contacted, Director Noah Mehalski of Bloomfield

Township Public Works Department; but no one from the township has gotten back with me.  When I telephone and spoke with someone in the Township, I am told that it may be a private culvert or Oakland County Road Commission problem.  A private culvert conveying water from four storm drains on Chestnut Run Drive to the back is nonsense. The Drain Commissioner has indicated that it is not a Drain Commission problem.

I would like to know if this is a Bloomfield Township repair issue and/or a Oakland County Road Commission issue.  As a member of the Oakland County Road Commission am hopeful that you can assist myself and my neighbors, the Jacksons with our concerns.

Thanks-

Bill Banks



**From:** willienardbanks@gmail.com
**Sent:** Sunday, July 25, 2021 5:03 PM
**To:** road@bloomfieldtwp.org; nmehalski@bloomfieldtwp.org
**Cc:** olivia.m.jacson@accenture.com; aaron.p.jackson@accenture.com; Renee Baugh
**Subject:** NOTICE OF DEFECT- Pub Acts 2001, No. 222,



Director Noah Mehalski
Road Division
Water and Sewer Division
Bloomfield Township Public Works Department
4200 Telegraph Road
P.O. Box 489
Bloomfield Township, MI 48303-0489

Dear Mr. Noah Mehalski:

It is my understanding that you are the Bloomfield Township's Public Works Department Director for the Public Road Division and the Water and Sewage Division.

For the last two months, I notice that my back yard located at 3173 Chestnut Run Drive and my neighbors' back yard located at 3197 Chestnut Run Drive has flooded. Although the flooding has not yet reached my home's basement or foundation, I decided to determine what is causing the flooding. I have live at 3173 Chestnut Run Drive for thirteen years and never seen my yard or my neighbors' yard at 3197 Chestnut Run Drive flood. I determine that the flooding is the result of a defect in the storm water drainage system. MCL 691.1416(j).

The purpose of this letter is to place Bloomfield Township on notice of a defect in the storm water drainage system that conveys storm water from Chestnut Run Drive to an large hole [ See Exhibits A & B] located approximately 140 feet from Chestnut Run Drive between 3173 Chestnut Run Drive and 3197 Chestnut Run Drive. The "defect" is defined as "a construction, design, maintenance, operation, or repair defect." MCL 691.1416(e). It appears that Bloomfield Township has failed to maintain the culvert or keep the storm drainage system clear of debris and obstructions.

During my investigation, I pumped the storm water from the hole, which exposed a culvert that lies buries approximately 3 or 4 feet in the ground. [See Exhibits C & D ] There are four drains that convey storm water into the culvert between 3173 Chestnut Run Drive and 3197 Chestnut Run Drive. [See Exhibits E & F ]. There is also a manhole nears the storm drains. [Exhibits G ]. Once the culvert fills the hole with storm water, the storm water races out of the hole in a torrent into my yard and my neighbors' yard, causing flooding. [See Exhibit H, I & J ].

My neighbors has young children. The hole [ See Exhibit A & B ] into which the culvert conveys storm water is at least three to four feet deep and present a drowning hazard for small children and pets. The storm runoff from the culvert needs to be directed further back into Orange Lake. And the hole, which is essentially a big open manhole needs to be closed up.

Please take the reasonable steps in a reasonable amount of time to repair, correct, or remedy this defect. If Bloomfield Township is not the "appropriate governmental agency" under MCL 691.1416(b) because Bloomfield Township is not the became the owner and operator of the storm drainage system on Chestnut Run Drive, please let me know who is the appropriate governmental agency."

Sincerely,

Willienard Banks
Attorney at Law
248-469-2682





















# EXHIBIT  11

# BLOOMFIELD TOWNSHIP
## Water Damage Claim Form

Full legal name(s) of Claimant(s): __Willienard Banks and Renee Baugh__

Full address(es) of Claimant(s): __3173 Chestnut Run Drive, Bloomfield Hills, Mi. 48302__

Telephone number(s) of Claimant(s): __248-469-2682__

Full address of affected property: __3173 Chestnut Run Drive, Bloomfield Hills, Mi. 48302__

Date of discovery of property damage and/or physical injury: __Sunday, August 22, 2021__

Brief description of claim: __See Attachment__

_____

_____

Description of property/ item damaged, if any, and of any physical injuries: _____

__See Attachment__

_____

**BLOOMFIELD
TOWNSHIP**

AUG 2 3 2021

**PUBLIC SERVICES**

**Please Return Form To:**
Tom Trice, Director
Public Works Division
4200 Telegraph
P.O. Box 489
Bloomfield Hills, MI 48303-0489

August 24, 2021

Claimant's Signature and Date

**Pursuant to State Statue, an
individual that has been injured or
has suffered property damage as a
result of a Sewage Disposal Event
must provide written notice of the
event within 45 days after the date the
damage or injury was, or in exercise
of reasonable diligence should have
been discovered. Failure to provide
proper notice will bar your claim.**

---

**FOR OFFICE USE ONLY**

Date received: _____      Report No. _____

Copy sent to Accounting: _____      Copy sent to MMRA: _____

S Water Sewer Backups and Shol Forms Water Claim Form doc   revised 10 14 05

**ATTACHMENT**

My name is Willienard Banks. My wife, Renee Baugh and I live at 3173 Chestnut Run Drive [Lot 6]. On Sunday August 23, 2021, there was a another overflow of your storm water disposal system onto real property ,i.e.,  3173 Chestnut Run Drive [Lot 6] and  3197 Chestnut Run Drive [Lot 7].

My wife, Renee Baugh and I moved into 3173 Chestnut Run Drive in 2008 and did not experience any flooding problems with our home until 2021. In fact, before 2021, we were unaware of any storm water  retention basin because the cat tails and other vegetation concealed it. I though that the storm water was being carried from Chestnut Run Drive to Orange Lake, as the drain easement indicates.

This year, fast moving storm water from the overflowing  retention basin has eroded away the cat tails and other concealing vegetation. Now, during heavy or continuous rains,  storm water from Bloomfield Township's storm water disposal system surcharges  out of its retention basin and flow  overland to my home. The flooding is so severe that the water levels reached the deck post of my real property. I am afraid because the storm water will damage my home's foundation.

# EXHIBIT  12

# BLOOMFIELD TOWNSHIP
## Water Damage Claim Form

Full legal name(s) of Claimant(s): Willienard Banks and Renee Baugh

Full address(es) of Claimant(s): 3173 Chestnut Run Drive, Bloomfield Hills, Mi. 48302

Telephone number(s) of Claimant(s): 248-469-2682

Full address of affected property: 3173 Chestnut Run Drive, Bloomfield Hills, Mi. 48302

Date of discovery of property damage and/or physical injury: September 21, 2021 and September 22, 2021

Brief description of claim: See Attachment

Description of property/ item damaged, if any, and of any physical injuries: See Attachment

**BLOOMFIELD TOWNSHIP**

SEP 2 8 2021

PUBLIC SERVICES To:
Tom Trice, Director
Public Works Division
4200 Telegraph
P.O. Box 489
Bloomfield Hills, MI 48303-0489

Claimant's Signature and Date

**Pursuant to State Statue, an individual that has been injured or has suffered property damage as a result of a Sewage Disposal Event must provide written notice of the event within 45 days after the date the damage or injury was, or in exercise of reasonable diligence should have been discovered. Failure to provide proper notice will bar your claim.**

---

**FOR OFFICE USE ONLY**

Date received: _____     Report No. _____

Copy sent to Accounting: _____     Copy sent to MMRA: _____

S. Water Sewer Back-ups and SSO Forms Water Claim Form.doc    revised 10-14-05

My wife, Renee Baugh and I purchased Lot 6 in the Chestnut Run Subdivision, commonly known as 3173 Chestnut Run Drive, on or about May 2, 2008. Aaron Jackson and his wife, Olivia Jackson purchased Lot 7, in the Chestnut Run Subdivision commonly known as 3197 Chestnut Run Drive on or about January 14, 2019.

The Chestnut Run Subdivision plat was recorded with the Oakland County Register of Deeds on January 14, 1985 in liber 184, pages 30 -35. As shown on liber 184, pages 31, Lot 6 and Lot 7, are encumbered by a 20 foot wide easement, with the markation, "DRAIN EASEMENT" between Lots 6 and 7, which run 470 feet from Chestnut Run Drive to the waters edge of Orange Lake. The dedicatory language of the plat on Liber 184, Page 25 provides in part "....THE LAND TO BE SURVEYED, DIVIDED, MAPPED AND DEDICATED AS REPRESENTED ON THIS PLAT, AND THAT THE STREETS ARE FOR THE USE OF THE PUBLIC, AND THAT THE PUBLIC UTILITIES EASEMENTS ARE PRIVATE EASEMENTS, AND THAT ALL OTHER EASEMENTS ARE FOR THE USES SHOWN ON THE PLAT..."

The dispute in this case involves a storm drain system with a retention basin that now overflows in a torrid of storm water and flood the backyards of Lot 6 and Lot 7. The Township made some repairs to the drain easement in 1999. The repair work included Bloomfield Township placed rip-rap concrete block in the retention basin to control erosion. It also appears that a silt fence to control soil erosion was used until the ground cover grew back. Recently, the force of the water coming out of the retention basin has washed the ground cover away. The storm water flow is getting dangerously close to my home's foundation and does not remain in the drain easement. Storm water is now flowing outside of the 20 foot wide easement. This year, storm water from the Township's storm water disposal system has overflowed the drain easement on a number of occasions, the most recent being September 21, 2021 and September 22, 2021.

# EXHIBIT  13



**RISK**

MICHIGAN MUNICIPAL
**RISK MANAGEMENT**
A U T H O R I T Y

September 7, 2021

Mr. Aaron Jackson
3197 Chestnut Run Dr.
Bloomfield Hills, MI 48301

Re:     Our Member            Bloomfield Township
        MMRMA Claim No.:  2104270
        Date of Loss:         07/29/2021
        Loss Location:        3197 Chestnut Run Dr.

Dear Mr. Jackson:

You recently filed a Notice of Claim with the Charter Township of Bloomfield pursuant to PA-222 of 2001. The Charter Township of Bloomfield is a Member of the Michigan Municipal Risk Management Authority (MMRMA). Your claim has been forwarded to me for processing.

Your claim arises out of a significate rain / storm event which culminated in the claimed flooding and / or water damage beginning on or about July 29, 2021. This event affected multiple homes and businesses throughout the Charter Township of Bloomfield.

The amount of precipitation which fell exceeded the capacity of the public infrastructure as well as private storm, drain, sum, grading and plumbing systems. The amount of precipitation and duration of the storm event were the catalysts of your claimed flooding and property damage. Therefore, in accordance with PA-222, the Charter Township of Bloomfield is not legally responsible, and your claim must be denied.

We have been advised that Bloomfield Township does not own any storm asset in the area. You may have available coverage through private homeowners' insurance.

Sincerely,

Jim Duffy
Senior Claims Adjuster

JD/dmc
CC:     Bloomfield Township

14001 Merriman Road • Livonia, MI 48154 • 734.513.0300 • 800.243.1324 • FAX 734.513.0318 • www.mmrma.org

# EXHIBIT  14

Walsh, Dani
RE: BLOOMFIELD TOWNSHIP'S STORM WATER DISPOSAL SYSTEM
Aug 26, 2021 at 12:15:40 PM
willienardbanks@gmail.com, Brook, Martin
Kepes, Brian
Barnett, Neal
Schostak, Michael
Stephanie Fakih
vmurry@bloomfieldtwp.org
oolstyn-budry@bloomfildtwp.org, kfortherby@bloomfieldtwp.org,
Roberts, Mark

Hello Willienard,

I am so sorry to hear about the water issues you are having due to the multiple historic rain events that we have had this summer.

I've lived here for 49 years and this is the first time I remember having over 10" of rain fall in a month. As a reference, our normal rainfall is 3" in one month. My basement has flooded multiple times due to these storms, so I empathize with you and share your frustration on the flooding due to these historic storm events.

We all take your concerns of county and private infrastructure and flooding issues very seriously.  Although Bloomfield Township does not own the storm drains, Noah Mehalski, the Board members, & I do work as advocates for residents with the RCOC, HOAs and other entities that are responsible for the maintenance. Unlike a City who owns their infrastructure and gets funding and resources from the state to maintain their specific infrastructure, Townships do not own the roads or storm sewers since those are at the County level so all funding and resources go directly to the County to maintain their specific infrastructure. Those of us with private easements in our residential areas bear the burden of maintaining our private easements.

We are in receipt of the claim you submitted to DPW this week. It is being reviewed. You will receive a response from the lawyer, Mark Robert, as soon as your claim is completed. At that time, he will be able to better explain or answer the legal questions you have about the county easements and private easements.

Again, I am sorry that you are experiencing the same issues that many residents, including my fellow board members and I, are having due to these storms. Having our basements flood 4 or 5 times since June 25th has been overwhelming as homeowners. We empathize with you as we address the private easements in our yards as well.


Regards,
Dani Walsh

Walsh, Dani
RE: BLOOMFIELD TOWNSHIP'S STORM WATER DISPOSAL SYSTEM
Aug 26, 2021 at 12:15:40 PM
willienardbanks@gmail.com, Brook, Martin
Kepes, Brian
Barnett, Neal
Schostak, Michael
Stephanie Fakih
vmurry@bloomfieldtwp.org
oolstyn-budry@bloomfildtwp.org, kfortherby@bloomfieldtwp.org,
Roberts, Mark

Hello Willienard,

I am so sorry to hear about the water issues you are having due to the multiple historic rain events that we have had this summer.

I've lived here for 49 years and this is the first time I remember having over 10" of rain fall in a month. As a reference, our normal rainfall is 3" in one month. My basement has flooded multiple times due to these storms, so I empathize with you and share your frustration on the flooding due to these historic storm events.

We all take your concerns of county and private infrastructure and flooding issues very seriously.  Although Bloomfield Township does not own the storm drains, Noah Mehalski, the Board members, & I do work as advocates for residents with the RCOC, HOAs and other entities that are responsible for the maintenance. Unlike a City who owns their infrastructure and gets funding and resources from the state to maintain their specific infrastructure, Townships do not own the roads or storm sewers since those are at the County level so all funding and resources go directly to the County to maintain their specific infrastructure. Those of us with private easements in our residential areas bear the burden of maintaining our private easements.

We are in receipt of the claim you submitted to DPW this week. It is being reviewed. You will receive a response from the lawyer, Mark Robert, as soon as your claim is completed. At that time, he will be able to better explain or answer the legal questions you have about the county easements and private easements.

Again, I am sorry that you are experiencing the same issues that many residents, including my fellow board members and I, are having due to these storms. Having our basements flood 4 or 5 times since June 25th has been overwhelming as homeowners. We empathize with you as we address the private easements in our yards as well.

Regards,
Dani Walsh

Dani Walsh
Bloomfield Township Supervisor
Charter Township of Bloomfield
4200 Telegraph Road
Bloomfield Hills, MI 48302
dwalsh@bloomfieldtwp.org
Phone: 248.433.7708
Fax: 248.642.7686
Bloomfield Township office hours are 7:00 AM to 5:30 PM Monday - Thursday.
Offices are closed on Fridays



**From:** willienardbanks@gmail.com <willienardbanks@gmail.com>
**Sent:** Tuesday, August 24, 2021 12:01 PM
**To:** Walsh, Dani <DWalsh@bloomfieldtwp.org>; Brook, Martin <MBrook@bloomfieldtwp.org>;
Kepes, Brian <BEKepes@bloomfieldtwp.org>; Barnett, Neal <NBarnett@bloomfieldtwp.org>;
Schostak, Michael <MSchostak@bloomfieldtwp.org>; Stephanie Fakih
<SFakih@bloomfieldtwp.org>; vmurry@bloomfieldtwp.org
**Cc:** oolstyn-budry@bloomfildtwp.org; kfortherby@bloomfieldtwp.org
**Subject:** BLOOMFIELD TOWNSHIP'S STORM WATER DISPOSAL SYSTEM

Dear Board of Trustees:

My name is Willienard Banks. My wife, Renee Baugh and I live at 3173 Chestnut Run Drive [Lot 6]. On Sunday August 22, 2021, we experience another, among other prior overflows of storm water on to our property from Bloomfield Township's storm water disposal system. We live at 3173 Chestnut Run Drive [Lot 6]. There is a 20 foot wide drain easement between our property and our neighbors, the Jackson, who reside at 3197 Chestnut Run Drive [Lot 7], which run from

Chestnut Run Drive to Orange Lake.

My wife, Renee Baugh and I moved into 3173 Chestnut Run Drive in 2008 and have not experience any flooding problems with our home until 2021. In fact, before 2021, we were unaware of any storm water retention basin on the drain easement because the cat tails and other vegetation concealed it. In fact, I thought that the storm water was being carried from Chestnut Run Drive directly to Orange Lake, as the drain easement indicates.

This year things changed drastically; large quantities of fast moving runoff storm water from the overflowing retention basin has eroded away dirt, the cat tails and other concealing vegetation. Now, during heavy or continuous rains, storm water from Bloomfield Township's storm water disposal system surcharges out of its retention basin and flow overland to my home. The flooding is so severe that the water levels reached the deck post of my real property. I am afraid that the storm water will damage my home's foundation.

I have conveyed my concerns to Bloomfield Township regarding repairing its storm water disposal system but have learned that it is Bloomfield Township's policy not to repair storm water disposal systems because they are on private easement to be maintained by the homeowners. As recently as August 16, 2021, I spoke with Engineering and Environmental Services Department, Director Oliva Olsztyn-Budry, over the telephone. She told me that the homeowner not Bloomfield Township is required to repair the storm water disposal system because the drain easements are private, not public easements. August 17, 2021, I visited Bloomfield Township's Public Works Department, where Katie Fotherby, the Public Works Manager told me the same thing.

Please have your attorney explain to me by e-mail or telephone the law supporting Bloomfield Township's policy that drain easements are private, not public easements.

Sincerely

Willienard Banks
248-469-2682



Dani Walsh
Bloomfield Township Supervisor
Charter Township of Bloomfield
4200 Telegraph Road
Bloomfield Hills, MI 48302
Phone: 248.433.7708
Fax: 248.642.7686
dwalsh@bloomfieldtwp.org
Bloomfield Township office hours are 7:00 AM to 5:30 PM Monday - Thursday.
Offices are closed on Fridays

**From:** williienardbanks@gmail.com < williienardbanks@gmail.com>
**Sent:** Tuesday, August 24, 2021 12:01 PM
**To:** Walsh, Dani <DWalsh@bloomfieldtwp.org>; Brook, Martin <MBrook@bloomfieldtwp.org>; Kepes, Brian <BEKepes@bloomfieldtwp.org>; Barnett, Neal <NBarnett@bloomfieldtwp.org>; Schostak, Michael <MSchostak@bloomfieldtwp.org>; Stephanie Fakih <SFakih@bloomfieldtwp.org>; vmurry@bloomfieldtwp.org
**Cc:** poslyn-budry@bloomfieldtwp.org; kfortherby@bloomfieldtwp.org

**Subject: BLOOMFIELD TOWNSHIP'S STORM WATER DISPOSAL SYSTEM**

Dear Board of Trustees:

My name is Williienard Banks. My wife, Renee Baugh and I live at 3173 Chestnut Run Drive [Lot 6]. On Sunday August 22, 2021, we experience another, among other prior overflows of storm water on to our property from Bloomfield Township's storm water disposal system. We live at 3173 Chestnut Run Drive [Lot 6]. There is a 20 foot wide drain easement between our property and our neighbors, the Jackson, who reside at 3197 Chestnut Run Drive [Lot 7], which run from

Chestnut Run Drive to Orange Lake.

My wife, Renee Baugh and I moved into 3173 Chestnut Run Drive in 2008 and have not experience any flooding problems with our home until 2021. In fact, before 2021, we were unaware of any storm water retention basin on the drain easement because the cat tails and other vegetation concealed it. In fact, I thought that the storm water was being carried from Chestnut Run Drive directly to Orange Lake, as the drain easement indicates.

This year things changed drastically; large quantities of fast moving runoff storm water from the overflowing retention basin has eroded away dirt, the cat tails and other concealing vegetation. Now, during heavy or continuous rains, storm water from Bloomfield Township's storm water disposal system surcharges out of its retention basin and flow overland to my home. The flooding is so severe that the water levels reached the deck post of my real property. I am afraid that the storm water will damage my home's foundation.

I have conveyed my concerns to Bloomfield Township regarding repairing its storm water disposal system but have learned that it is Bloomfield Township's policy not to repair storm water disposal systems because they are on private easement to be maintained by the homeowners. As recently as August 16, 2021, I spoke with Engineering and Environmental Services Department, Director Oliva Olszyn-Budy, over the telephone. She told me that the homeowner not Bloomfield Township is required to repair the storm water disposal system because the drain easements are private, not public easements. August 17, 2021, I visited Bloomfield Township's Public Works Department, where Katie Fotherby, the Public Works Manager told me the same thing.

Please have your attorney explain to me by e-mail or telephone the law supporting Bloomfield Township's policy that drain easements are private, not public easements.

Sincerely

Willienard Banks

248-469-2682

# EXHIBIT  15

Case 2:23-cv-10258-LJM-EAS ECF No. 1-5, PageID.288 Filed 02/01/23 Page 86 of 98



# EXHIBIT 16

9:26   ···    ···

←  Chestnut Run So... 🔍 ↪ •••

**Cindi Hopkins** •••
Admin · Jul 8, 2019 · 🖼

The work on the roads began this morning! Right now you have to use the "out" driveway to enter. Stoneridge - east side - first to be dug up - grass only.



✏ Create Post

|||  

# EXHIBIT 17

# MCLS § 565.957

This document is current through Act 81 of the 2021 Regular Legislative Session and E.R.O. 2021-1

*Michigan Compiled Laws Service* > *Chapter 565 Conveyances of Real Property (§§ 565.1 — 565.966)* > *Act 92 of 1993 (§§ 565.951 — 565.966)*

## § 565.957. *Disclosure*; form.

Sec. 7.

(1)The *disclosures* required by this act shall be made on the following form:

### SELLER'S DISCLOSURE STATEMENT

*Property* Address: _____

_____ Michigan

**Purpose of *Statement*:** This *statement* is a *disclosure* of the condition of the *property* in compliance with the *seller disclosure* act. This *statement* is a *disclosure* of the condition and information concerning the *property*, known by the *seller*. Unless otherwise advised, the *seller* does not possess any expertise in construction, architecture, engineering, or any other specific area related to the construction or condition of the improvements on the *property* or the land. Also, unless otherwise advised, the *seller* has not conducted any inspection of generally inaccessible areas such as the foundation or roof. This *statement* is not a warranty of any kind by the *seller* or by any agent representing the *seller* in this transaction, and is not a substitute for any inspections or warranties the buyer may wish to obtain.

***Seller*'s Disclosure:** The *seller* discloses the following information with the knowledge that even though this is not a warranty, the *seller* specifically makes the following representations based on the *seller*'s knowledge at the signing of this document. Upon receiving this *statement* from the *seller*, the *seller*'s agent is required to provide a copy to the buyer or the agent of the buyer. The *seller* authorizes its agent(s) to provide a copy of this *statement* to any prospective buyer in connection with any actual or anticipated sale of *property*. The following are representations made solely by the *seller* and are not the representations of the *seller*'s agent(s), if any. **THIS INFORMATION IS A DISCLOSURE ONLY AND IS NOT INTENDED TO BE A PART OF ANY CONTRACT BETWEEN BUYER AND SELLER.**

**Instructions to the *Seller*:** (1) Answer ALL questions. (2) Report known conditions affecting the *property*. (3) Attach additional pages with your signature if additional space is required. (4) Complete this form yourself. (5) If some items do not apply to your *property*, check NOT AVAILABLE. If you do not know the facts, check UNKNOWN. FAILURE TO PROVIDE A PURCHASER WITH A SIGNED *DISCLOSURE STATEMENT* WILL ENABLE A PURCHASER TO TERMINATE AN OTHERWISE BINDING PURCHASE AGREEMENT.

**Appliances/Systems/Services:** The items below are in working order (the items below are included in the sale of the *property* only if the purchase agreement so provides):

MCLS § 565.957

**Appliances/Systems/Services:** The items below are in working order (the items below are included in the sale of the *property* only if the purchase agreement so provides):

| | Yes | No | Unknown | Not Available |
|---|---|---|---|---|
| Range/Oven | | | | |
| Dishwasher | | | | |
| Refrigerator | | | | |
| Hood/fan | | | | |
| Disposal | | | | |
| TV antenna, TV rotor & controls | | | | |
| Electrical system | | | | |
| Garage door opener & remote control | | | | |
| Alarm system | | | | |
| Intercom | | | | |
| Central vacuum | | | | |
| Attic fan | | | | |
| Pool heater, wall liner & equipment | | | | |
| Microwave | | | | |
| Trash compactor | | | | |
| Ceiling fan | | | | |

Willienard Banks

MCLS § 565.957

Any pending litigation that could affect the *property* or the *seller*'s right to convey the *property*?

|  | unknown | yes | no |
|---|---|---|---|
|  | ___ | ___ | ___ |
|  | ___ | ___ | ___ |
|  | ___ | ___ | ___ |
|  | ___ | ___ | ___ |
|  |  | ___ | ___ |
|  |  | ___ | ___ |
|  |  | ___ | ___ |

If the answer to any of these questions is yes, please explain. Attach additional sheets, if necessary:

_____

_____

_____

_____

_____

The *seller* has lived in the residence on the *property* from _____(date) to _____(date). The *seller* has owned the *property* since _____(date). The *seller* has indicated above the condition of all the items based on information known to the *seller*. If any changes occur in the structural/mechanical/appliance systems of this *property* from the date of this form to the date of closing, *seller* will immediately disclose the changes to buyer. In no event shall the parties hold the broker liable for any representations not directly made by the broker or broker's agent.

*Seller* certifies that the information in this *statement* is true and correct to the best of *seller*'s knowledge as of the date of *seller*'s signature.

BUYER SHOULD OBTAIN PROFESSIONAL ADVICE AND INSPECTIONS OF THE *PROPERTY* TO MORE FULLY DETERMINE THE CONDITION OF THE *PROPERTY*. THESE INSPECTIONS SHOULD TAKE INDOOR AIR AND WATER QUALITY INTO ACCOUNT, AS WELL AS ANY EVIDENCE OF UNUSUALLY HIGH LEVELS OF POTENTIAL ALLERGENS INCLUDING, BUT NOT LIMITED TO, HOUSEHOLD MOLD, MILDEW AND BACTERIA.

BUYERS ARE ADVISED THAT CERTAIN INFORMATION COMPILED PURSUANT TO THE SEX OFFENDERS REGISTRATION ACT, 1994 PA 295, MCL 28.721 TO 28.732, IS AVAILABLE TO THE PUBLIC. BUYERS SEEKING THAT INFORMATION SHOULD CONTACT THE APPROPRIATE LOCAL LAW ENFORCEMENT AGENCY OR SHERIFF'S DEPARTMENT DIRECTLY.

BUYER IS ADVISED THAT THE STATE EQUALIZED VALUE OF THE *PROPERTY*, PRINCIPAL RESIDENCE EXEMPTION INFORMATION, AND OTHER REAL *PROPERTY* TAX INFORMATION IS AVAILABLE FROM THE APPROPRIATE LOCAL ASSESSOR'S OFFICE. **BUYER SHOULD NOT ASSUME THAT BUYER'S FUTURE TAX BILLS ON THE *PROPERTY* WILL BE THE SAME AS THE *SELLER*'S PRESENT TAX BILLS. UNDER MICHIGAN LAW, REAL *PROPERTY* TAX OBLIGATIONS CAN CHANGE SIGNIFICANTLY WHEN *PROPERTY* IS TRANSFERRED.**

*Seller* _____     Date _____

*Seller* _____     Date _____

Buyer has read an acknowledges receipt of this *statement*.

Willienard Banks

unknown yes no

Any underground storage tanks?

unknown yes no

Farm or farm operation in the vicinity; or proximity to a landfill, airport, shooting range, etc.

unknown yes no

Any outstanding utility assessments or fees, including any natural gas main extension surcharge?

unknown yes no

Any outstanding municipal assessments or fees?

unknown yes no

features whose use or responsibility for maintenance may have an effect on the ***property***?

unknown yes no

2. Any encroachments, easements, zoning violations, or nonconforming uses?

unknown yes no

Any "common areas" (facilities like pools, tennis courts, walkways, or other areas co-owned with others), or a homeowners' association that has any authority over the ***property***?

unknown yes no

Structural modifications alterations, or repairs made without necessary permits or licensed contractors?

unknown yes no

Settling, flooding, drainage, structural, or grading problems?

unknown yes no

Major damage to the ***property*** from fire, wind, floods, or landslides?

MCLS § 565.957

If yes, date of last report/results: ____________________

**Septic tanks/drain fields:** Condition, if known: ____________________

____________________

**Heating System:** Type approximate age: ____________________

**Plumbing system:** Type: copper ____________________ galvanized ____________________ other ____________________

**Electrical system:** Any known problems? ____________________

____________________

**History of infestation, if any:** (termites, carpenter ants, etc.)

**Environmental problems:** Are you aware of any substances, materials, or products that may be an environmental hazard such as, but not limited to, asbestos, radon gas, formaldehyde, lead-based paint, fuel or chemical storage tanks and contaminated soil on the *property*.

unknown yes no

If yes, please explain: ____________________

____________________

**Flood insurance:** Do you have flood insurance on the *property*?

unknown yes no

**Mineral rights:** Do you own the mineral rights?

unknown yes no

**Other Items:** Are you aware of any of the following:

Features of the *property* shared in common with the adjoining landowners, such as walls, fences, roads and driveways, or other

Willienard Banks

MCLS § 565.957

Explanations (attach additional sheets if necessary):

_______________

_______________

_______________

_______________

_______________

UNLESS OTHERWISE AGREED, ALL HOUSEHOLD APPLIANCES ARE SOLD IN WORKING ORDER EXCEPT AS NOTED, WITHOUT WARRANTY BEYOND DATE OF CLOSING.

- **Basement/crawl space:** Has there been evidence of water? yes ___ no ___

  If yes, please explain: _______________

- **Insulation:** Describe, if known: _______________

  Urea Formaldehyde Foam Insulation (UFFI) is installed? unknown ___ yes ___ no ___

- **Roof:** Leaks? yes ___ no ___

  Approximate age if known _______________

- **Well:** Type of well (depth/diameter, age, and repair history, if known): _______________

  Has the water been tested? yes ___ no ___

MCLS § 565.957

**Appliances/Systems/Services: The items below are in working order (the items below are included in the sale of the *property* only if the purchase agreement so provides):**

Electronic air filter

Solar heating system

Fireplace & chimney

Wood burning system

MCLS § 565.957

**Appliances/Systems/Services:** The items below are in working order (the items below are included in the sale of the *property* only if the purchase agreement so provides):

| | | | | |
|---|---|---|---|---|
| Sauna/hot tub | ___ | ___ | ___ | ___ |
| Washer | ___ | ___ | ___ | ___ |
| Dryer | ___ | ___ | ___ | ___ |
| Lawn sprinkler system | ___ | ___ | ___ | ___ |
| Water heater | ___ | ___ | ___ | ___ |
| Plumbing system | ___ | ___ | ___ | ___ |
| Water softener/conditioner | ___ | ___ | ___ | ___ |
| Well & pump | ___ | ___ | ___ | ___ |
| Septic tank & drain field | ___ | ___ | ___ | ___ |
| Sump pump | ___ | ___ | ___ | ___ |
| City Water System | ___ | ___ | ___ | ___ |
| City Sewer System | ___ | ___ | ___ | ___ |
| Central air conditioning | ___ | ___ | ___ | ___ |
| Central heating system | ___ | ___ | ___ | ___ |
| Wall furnace | ___ | ___ | ___ | ___ |
| Humidifier | ___ | ___ | ___ | ___ |

Willienard Banks